GEDULDIG, DIRECTOR, DEPARTMENT OF
HUMAN RESOURCES DEVELOPMENT
*v.* AIELLO ET AL.

No. 73–640. Argued March 26, 1974—Decided June 17, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post,* p. 497.

*Joanne Condas,* Deputy Attorney General of California, argued the cause for appellant. With her on the briefs were *Evelle J. Younger,* Attorney General, and *Elizabeth Palmer,* Assistant Attorney General.

*Wendy W. Williams* argued the cause for appellees. With her on the briefs were *Peter Hart Weiner, Roland C. Davis,* and *Victor J. Van Bourg.**

---

*Briefs of *amici curiae* urging reversal were filed by *Milton A. Smith, Gerard C. Smetana, Lawrence D. Ehrlich,* and *Jerry Kronenberg* for the Chamber of Commerce of the United States; by *Ronald A. Zumbrun* and *Raymond M. Momboisse* for the Pacific Legal Foundation; by *Richard D. Godown* and *Myron G. Hill, Jr.,* for the National Association of Manufacturers of the United States; by *Willard Z. Carr, Jr.,* for the Merchants and Manufacturers Assn.;

486

MR. JUSTICE STEWART delivered the opinion of the Court.

For almost 30 years California has administered a disability insurance system that pays benefits to persons in private employment who are temporarily unable to work because of disability not covered by workmen's compensation. The appellees brought this action to challenge the constitutionality of a provision of the California program that, in defining "disability," excludes from coverage certain disabilities resulting from pregnancy. Because the appellees sought to enjoin the enforcement of this state statute, a three-judge court was convened pursuant to 28 U. S. C. §§ 2281 and 2284.[1] On

by *F. Mark Garlinghouse* and *James D. Hutchinson* for the American Telephone and Telegraph Co.; and by *Theophil C. Kammholz, Stanley R. Strauss, John S. Battle, Jr.*, and *J. Robert Brame III* for the General Electric Co.

Briefs of *amici curiae* urging affirmance were filed by *Joseph T. Eddins* and *Beatrice Rosenberg* for the United States Equal Employment Opportunity Commission; by *Ruth Bader Ginsburg* and *Melvin L. Wulf* for the American Civil Liberties Union et al.; by *J. Albert Woll, Laurence Gold*, and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations; by *Winn Newman* and *Ruth Weyand* for the International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC; by *Joseph N. Onek* for Women's Equity Action League et al.; and by *Harry I. Rand* for the Physicians Forum.

[1] This litigation began as two separate suits on behalf of California employees who had paid sufficient amounts into the Disability Fund to be eligible generally for benefits under the program. Carolyn Aiello brought her suit against appellant in the Federal District Court. Augustina Armendariz, Elizabeth Johnson, and Jacqueline Jaramillo jointly initiated their suit as a petition for a writ of mandate in the California Supreme Court. Both suits were brought as class actions and asserted the unconstitutionality of § 2626 of the California Unemployment Insurance Code under the Equal Protection Clause of the Fourteenth Amendment. The appellant removed the state court suit to the Federal District Court, where the two actions were consolidated. See 28 U. S. C. § 1441 (b).

the appellees' motion for summary judgment, the District Court, by a divided vote, held that this provision of the disability insurance program violates the Equal Protection Clause of the Fourteenth Amendment, and therefore enjoined its continued enforcement. 359 F. Supp. 792. The District Court denied a motion to stay its judgment pending appeal. The appellant thereupon filed a similar motion in this Court, which we granted. 414 U. S. 897. We subsequently noted probable jurisdiction of the appeal. 414 U. S. 1110.

I

California's disability insurance system is funded entirely from contributions deducted from the wages of participating employees. Participation in the program is mandatory unless the employees are protected by a voluntary private plan approved by the State.[2] Each employee is required to contribute one percent of his salary, up to an annual maximum of $85.[3] These contributions are placed in the Unemployment Compensation Disability Fund, which is established and administered as a special trust fund within the state treasury.[4] It is from this Disability Fund that benefits under the program are paid.

An individual is eligible for disability benefits if, during a one-year base period prior to his disability, he has contributed one percent of a minimum income of $300 to the Disability Fund.[5] In the event he suffers a compensable disability, the individual can receive a "weekly benefit amount" of between $25 and $105, depending on the amount he earned during the highest quarter of the

---

[2] Cal. Unemp. Ins. Code §§ 3251–3254.

[3] §§ 984, 985, 2901.

[4] § 3001.

[5] § 2652.

base period.[6] Benefits are not paid until the eighth day of disability, unless the employee is hospitalized, in which case benefits commence on the first day of hospitalization.[7] In addition to the "weekly benefit amount," a hospitalized employee is entitled to receive "additional benefits" of $12 per day of hospitalization.[8] "Weekly benefit amounts" for any one disability are payable for 26 weeks so long as the total amount paid does not exceed one-half of the wages received during the base period.[9] "Additional benefits" for any one disability are paid for a maximum of 20 days.[10]

In return for his one-percent contribution to the Disability Fund, the individual employee is insured against the risk of disability stemming from a substantial number of "mental or physical illness[es] and mental or physical injur[ies]." Cal. Unemp. Ins. Code § 2626. It is not every disabling condition, however, that triggers the obligation to pay benefits under the program. As already noted, for example, any disability of less than eight days' duration is not compensable, except when the employee is hospitalized. Conversely, no benefits are payable for any single disability beyond 26 weeks. Further, disability is not compensable if it results from the individual's court commitment as a dipsomaniac, drug addict, or sexual psychopath.[11] Finally, § 2626 of the Unem-

---

[6] § 2655. This provision has been amended, effective July 1, 1974, to provide for a maximum weekly benefit amount of $119.

[7] §§ 2627 (b) and 2802.

[8] § 2801.

[9] § 2653.

[10] § 2801. Section 2608 provides a formula for determining whether a disabling condition that is intermittent is one disability or more than one disability for purposes of applying the limitations in §§ 2653 and 2801 on the maximum amount of benefits payable.

[11] § 2678. Sections 2675–2677 contain various other factors that will disqualify an employee from receiving benefits but that relate to matters other than the nature of the disabling condition.

ployment Insurance Code excludes from coverage certain disabilities that are attributable to pregnancy. It is this provision that is at issue in the present case.

Appellant is the Director of the California Department of Human Resources Development.[12] He is responsible for the administration of the State's disability insurance program. Appellees are four women who have paid sufficient amounts into the Disability Fund to be eligible for benefits under the program. Each of the appellees became pregnant and suffered employment disability as a result of her pregnancy. With respect to three of the appellees, Carolyn Aiello, Augustina Armendariz, and Elizabeth Johnson, the disabilities were attributable to abnormal complications encountered during their pregnancies.[13] The fourth, Jacqueline Jaramillo, experienced a normal pregnancy, which was the sole cause of her disability.

At all times relevant to this case, § 2626 of the Unemployment Insurance Code provided:

> " 'Disability' or 'disabled' includes both mental or physical illness and mental or physical injury. An individual shall be deemed disabled in any day in which, because of his physical or mental condition, he is unable to perform his regular or customary work. *In no case shall the term 'disability' or 'disabled' include any injury or illness caused by or arising in connection with pregnancy up to the termination of such pregnancy and for a period of 28 days thereafter.*" (Emphasis added.)

---

[12] Effective July 1, 1974, the Department of Human Resources Development will be renamed the Department of Employment Development. See Cal. Unemp. Ins. Code § 301 *et seq.*

[13] Aiello and Johnson suffered ectopic and tubal pregnancies, respectively, which required surgery to terminate the pregnancies. Armendariz suffered a miscarriage.

Appellant construed and applied the final sentence of this statute to preclude the payment of benefits for any disability resulting from pregnancy. As a result, the appellees were ruled ineligible for disability benefits by reason of this provision, and they sued to enjoin its enforcement. The District Court, finding "that the exclusion of pregnancy-related disabilities is not based upon a classification having a rational and substantial relationship to a legitimate state purpose," held that the exclusion was unconstitutional under the Equal Protection Clause. 359 F. Supp., at 801.

Shortly before the District Court's decision in this case, the California Court of Appeal, in a suit brought by a woman who suffered an ectopic pregnancy, held that § 2626 does not bar the payment of benefits on account of disability that results from medical complications arising during pregnancy. *Rentzer* v. *Unemployment Insurance Appeals Board,* 32 Cal. App. 3d 604, 108 Cal. Rptr. 336 (1973).[14] The state court construed the statute to preclude only the payment of benefits for disability accompanying normal pregnancy.[15] The appel-

[14] In an earlier decision, the Court of Appeal had sustained § 2626 against an equal protection challenge by a female employee who had suffered disability as a result of normal pregnancy and delivery. *Clark* v. *California Employment Stabilization Comm'n,* 166 Cal. App. 2d 326, 332 P. 2d 716 (1958).

[15] Section 2626 was later amended, and a new § 2626.2 was added, in order clearly to reflect this interpretation. The two sections now provide as follows:

§ 2626 " 'Disability' or 'disabled' includes both mental or physical illness, mental or physical injury, and, to the extent specified in Section 2626.2, pregnancy. An individual shall be deemed disabled in any day in which, because of his physical or mental condition, he is unable to perform his regular or customary work."

§ 2626.2 "Benefits relating to pregnancy shall be paid under this part only in accordance with the following:

"(a) Disability benefits shall be paid upon a doctor's certification

lant acquiesced in this construction and issued administrative guidelines that exclude only the payment of "maternity benefits"—*i. e.*, hospitalization and disability benefits for normal delivery and recuperation.

Although *Rentzer* was decided some 10 days before the District Court's decision in this case, there was apparently no opportunity to call the court's attention to it. The appellant, therefore, asked the court to reconsider its decision in light of the construction that the California Court of Appeal had given to § 2626 in the *Rentzer* case. By a divided vote, the court denied the motion for reconsideration. Although a more definitive ruling would surely have been preferable, we interpret the District Court's denial of the appellant's motion as a determination that its decision was not affected by the limiting construction given to § 2626 in *Rentzer*.

Because of the *Rentzer* decision and the revised administrative guidelines that resulted from it, the appellees Aiello, Armendariz, and Johnson, whose disabilities were attributable to causes other than normal pregnancy and delivery, became entitled to benefits under the disability insurance program, and their claims have since been paid. With respect to appellee Jaramillo, however, whose disability stemmed solely from normal pregnancy and childbirth, § 2626 continues to bar the

---

that the claimant is disabled because of an abnormal and involuntary complication of pregnancy, including but not limited to: puerperal infection, eclampsia, caesarian section delivery, ectopic pregnancy, and toxemia.

"(b) Disability benefits shall be paid upon a doctor's certification that a condition possibly arising out of pregnancy would disable the claimant without regard to the pregnancy, including but not limited to: anemia, diabetes, embolism, heart disease, hypertension, phlebitis, phlebothrombosis, pyelonephritis, thrombophlebitis, vaginitis, varicose veins, and venous thrombosis."

These amendments took effect on January 1, 1974.

payment of any benefits. It is evident that only Jaramillo continues to have a live controversy with the appellant as to the validity of § 2626. The claims of the other appellees have been mooted by the change that *Rentzer* worked in the construction and application of that provision. Thus, the issue before the Court on this appeal is whether the California disability insurance program invidiously discriminates against Jaramillo and others similarly situated by not paying insurance benefits for disability that accompanies normal pregnancy and childbirth.

II

It is clear that California intended to establish this benefit system as an insurance program that was to function essentially in accordance with insurance concepts.[16] Since the program was instituted in 1946, it has been totally self-supporting, never drawing on general state revenues to finance disability or hospital benefits. The Disability Fund is wholly supported by the one percent of wages annually contributed by participating employees. At oral argument, counsel for the appellant informed us that in recent years between 90% and

---

[16] In his message to the state legislature proposing the creation of this program, Governor Earl Warren stated:

"It is not possible for employees to obtain from private insurance companies protection against loss of wages or salary during sickness as adequately or cheaply as that protection could be obtained by diverting their present 1 per cent contribution for the support of a Disability Benefits Program." California Senate Journal, Jan. 23, 1946, p. 229.

The California Supreme Court has concluded "that the legislative purpose in providing unemployment disability benefits . . . was to provide an insurance program to pay benefits to individuals who are unemployed because of illness or injury. . . ." *Garcia* v. *Industrial Accident Comm'n*, 41 Cal. 2d 689, 692, 263 P. 2d 8, 10 (1953) (internal quotation marks omitted).

103% of the revenue to the Disability Fund has been paid out in disability and hospital benefits. This history strongly suggests that the one-percent contribution rate, in addition to being easily computable, bears a close and substantial relationship to the level of benefits payable and to the disability risks insured under the program.

Over the years California has demonstrated a strong commitment not to increase the contribution rate above the one-percent level. The State has sought to provide the broadest possible disability protection that would be affordable by all employees, including those with very low incomes. Because any larger percentage or any flat dollar-amount rate of contribution would impose an increasingly regressive levy bearing most heavily upon those with the lowest incomes, the State has resisted any attempt to change the required contribution from the one-percent level. The program is thus structured, in terms of the level of benefits and the risks insured, to maintain the solvency of the Disability Fund at a one-percent annual level of contribution.[17]

In ordering the State to pay benefits for disability accompanying normal pregnancy and delivery, the District Court acknowledged the State's contention "that coverage of these disabilities is so extraordinarily expensive that it would be impossible to maintain a program supported by employee contributions if these disabilities are included." 359 F. Supp., at 798. There is considerable disagreement between the parties with respect to how great the increased costs would actually be, but they

---

[17] Section 2604 of the Unemployment Insurance Code vests the Governor and the appellant with authority to modify the payment of benefits and to increase the waiting time for eligibility if such steps are necessary to forestall insolvency of the Disability Fund. But neither the Governor nor the appellant is authorized to increase the contribution rate under any circumstances.

would clearly be substantial.[18]  For purposes of analysis the District Court accepted the State's estimate, which was in excess of $100 million annually, and stated: "[I]t is clear that including these disabilities would not destroy the program. The increased costs could be accommodated quite easily by making reasonable changes in the contribution rate, the maximum benefits allowable, and the other variables affecting the solvency of the program." *Ibid.*

Each of these "variables"—the benefit level deemed appropriate to compensate employee disability, the risks selected to be insured under the program, and the contribution rate chosen to maintain the solvency of the program and at the same time to permit low-income employees to participate with minimal personal sacrifice—represents a policy determination by the State. The essential issue in this case is whether the Equal Protection Clause requires such policies to be sacrificed or compromised in order to finance the payment of benefits to those whose disability is attributable to normal pregnancy and delivery.

We cannot agree that the exclusion of this disability from coverage amounts to invidious discrimination under the Equal Protection Clause. California does not discriminate with respect to the persons or groups which are eligible for disability insurance protection under the program. The classification challenged in this case relates to the asserted underinclusiveness of the set of risks that the State has selected to insure. Although California has created a program to insure most risks of employment

---

[18] Appellant's estimate of the increased cost of including normal pregnancy within the insured risks has varied between $120.2 million and $131 million annually, or between a 33% and 36% increase in the present amount of benefits paid under the program. On the other hand, appellee contends that the increased cost would be $48.9 million annually, or a 12% increase over present expenditures.

disability, it has not chosen to insure all such risks, and this decision is reflected in the level of annual contributions exacted from participating employees. This Court has held that, consistently with the Equal Protection Clause, a State "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others. . . ." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489 (1955); *Jefferson* v. *Hackney*, 406 U. S. 535 (1972). Particularly with respect to social welfare programs, so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge* v. *Williams*, 397 U. S. 471, 486–487 (1970).

The District Court suggested that moderate alterations in what it regarded as "variables" of the disability insurance program could be made to accommodate the substantial expense required to include normal pregnancy within the program's protection. The same can be said, however, with respect to the other expensive class of disabilities that are excluded from coverage—short-term disabilities. If the Equal Protection Clause were thought to compel disability payments for normal pregnancy, it is hard to perceive why it would not also compel payments for short-term disabilities suffered by participating employees.[19]

It is evident that a totally comprehensive program would be substantially more costly than the present program and would inevitably require state subsidy, a higher

---

[19] The same could be said of disabilities continuing beyond 26 weeks.

rate of employee contribution, a lower scale of benefits for those suffering insured disabilities, or some combination of these measures. There is nothing in the Constitution, however, that requires the State to subordinate or compromise its legitimate interests solely to create a more comprehensive social insurance program than it already has.

The State has a legitimate interest in maintaining the self-supporting nature of its insurance program. Similarly, it has an interest in distributing the available resources in such a way as to keep benefit payments at an adequate level for disabilities that are covered, rather than to cover all disabilities inadequately. Finally, California has a legitimate concern in maintaining the contribution rate at a level that will not unduly burden participating employees, particularly low-income employees who may be most in need of the disability insurance.

These policies provide an objective and wholly noninvidious basis for the State's decision not to create a more comprehensive insurance program than it has. There is no evidence in the record that the selection of the risks insured by the program worked to discriminate against any definable group or class in terms of the aggregate risk protection derived by that group or class from the program.[20] There is no risk from which men are pro-

---

[20] The dissenting opinion to the contrary, this case is thus a far cry from cases like *Reed* v. *Reed*, 404 U. S. 71 (1971), and *Frontiero* v. *Richardson*, 411 U. S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification like those considered in *Reed, supra,* and *Frontiero, supra.* Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts de-

tected and women are not. Likewise, there is no risk from which women are protected and men are not.[21]

The appellee simply contends that, although she has received insurance protection equivalent to that provided all other participating employees, she has suffered discrimination because she encountered a risk that was outside the program's protection. For the reasons we have stated, we hold that this contention is not a valid one under the Equal Protection Clause of the Fourteenth Amendment.

The stay heretofore issued by the Court is vacated, and the judgment of the District Court is

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

Relying upon *Dandridge* v. *Williams,* 397 U. S. 471 (1970), and *Jefferson* v. *Hackney,* 406 U. S. 535 (1972),

---

signed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.

[21] Indeed, the appellant submitted to the District Court data that indicated that both the annual claim rate and the annual claim cost are greater for women than for men. As the District Court acknowledged, "women contribute about 28 percent of the total disability insurance fund and receive back about 38 percent of the fund in benefits." 359 F. Supp. 792, 800. Several *amici curiae* have reprepresented to the Court that they have had a similar experience under private disability insurance programs.

the Court today rejects appellees' equal protection claim and upholds the exclusion of normal-pregnancy-related disabilities from coverage under California's disability insurance program on the ground that the legislative classification rationally promotes the State's legitimate cost-saving interests in "maintaining the self-supporting nature of its insurance program[,] . . . distributing the available resources in such a way as to keep benefit payments at an adequate level for disabilities that are covered, . . . [and] maintaining the contribution rate at a level that will not unduly burden participating employees . . . ." *Ante,* at 496. Because I believe that *Reed* v. *Reed,* 404 U. S. 71 (1971), and *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), mandate a stricter standard of scrutiny which the State's classification fails to satisfy, I respectfully dissent.

California's disability insurance program was enacted to supplement the State's unemployment insurance and workmen's compensation programs by providing benefits to wage earners to cushion the economic effects of income loss and medical expenses resulting from sickness or injury. The legislature's intent in enacting the program was expressed clearly in § 2601 of the Unemployment Insurance Code:

> "The purpose of this part is to compensate in part for the wage loss sustained by individuals unemployed because of sickness or injury and to reduce to a minimum the suffering caused by unemployment resulting therefrom. This part shall be construed liberally in aid of its declared purpose to mitigate the evils and burdens which fall on the unemployed and disabled worker and his family."

To achieve the Act's broad humanitarian goals, the legislature fashioned a pooled-risk disability fund cov-

ering all employees at the same rate of contribution,[1] regardless of individual risk.[2] The only requirement that must be satisfied before an employee becomes eligible to receive disability benefits is that the employee must have contributed one percent of a minimum income of $300 during a one-year base period. Cal. Unemp. Ins. Code § 2652. The "basic benefits," varying from $25 to $119 per week, depending upon the employee's base-period earnings, begin on the eighth day of disability or on the first day of hospitalization. §§ 2655, 2627 (b), 2802. Benefits are payable for a maximum of 26 weeks, but may not exceed one-half of the employee's total base-period earnings. § 2653. Finally, compensation is paid for virtually all disabling conditions without regard to cost, voluntariness, uniqueness, predictability, or "normalcy" of the disability.[3] Thus, for example, workers are compensated for costly disabilities such as heart attacks, voluntary disabilities such as cosmetic sur-

---

[1] An employee must contribute one percent of his annual wages, not exceeding a total contribution of $85 per year ($90 for calendar year 1974 and thereafter). Cal. Unemp. Ins. Code §§ 984, 985, 2901. The ceiling on wages subject to the one-percent contribution rate, of course, introduces a regressive element in the contribution scheme. Perhaps in recognition of this fact, the disability benefits schedule is designed to grant proportionately greater benefits to more poorly paid workers. § 2655.

[2] California deliberately decided not to classify employees on the basis of actuarial data. Thus, the contribution rate for a particular group of employees is not tied to that group's predicted rate of disability claims. 359 F. Supp. 792, 800.

[3] While the Code technically excludes from coverage individuals under court commitment for dipsomania, drug addiction, or sexual psychopathy, Cal. Unemp. Ins. Code § 2678, the Court was informed by the Deputy Attorney General of California at oral argument that court commitment for such disabilities is "a fairly archaic practice" and that "it would be unrealistic to say that they constitute valid exclusions." Tr. of Oral Arg. 13.

gery or sterilization, disabilities unique to sex or race such as prostatectomies or sickle-cell anemia, pre-existing conditions inevitably resulting in disability such as degenerative arthritis or cataracts, and "normal" disabilities such as removal of irritating wisdom teeth or other orthodontia.

Despite the Code's broad goals and scope of coverage, compensation is denied for disabilities suffered in connection with a "normal" pregnancy—disabilities suffered only by women. Cal. Unemp. Ins. Code §§ 2626, 2626.2 (Supp. 1974). Disabilities caused by pregnancy, however, like other physically disabling conditions covered by the Code, require medical care, often include hospitalization, anesthesia and surgical procedures, and may involve genuine risk to life.[4] Moreover, the economic effects

---

[4] On March 2, 1974, the American College of Obstetricians and Gynecologists adopted the following Policy Statement on Pregnancy-related Disabilities:

"Pregnancy is a physiological process. All pregnant patients, however, have a variable degree of disability on an individual basis, as indicated below, during which time they are unable to perform their usual activities. (1) In an uncomplicated pregnancy, disability occurs near the termination of pregnancy, during labor, delivery, and the puerperium. The process of labor and puerperium is disabling in itself. The usual duration of such disability is approximately six to eight weeks. (2) Complications of a pregnancy may occur which give rise to other disability. Examples of such complications include toxemia, infection, hemorrhage, ectopic pregnancy, and abortion. (3) A woman with pre-existing disease which in itself is not disabling, may become disabled with the addition of pregnancy. Certain patients with heart disease, diabetes, hypertensive cardiovascular disease, renal disease, and other systemic conditions may become disabled during their pregnancy because of the adverse effect pregnancy has upon these conditions.

"The onset, termination and cause of the disability, related to pregnancy, can only be determined by a physician." Brief for Appellees 59–60.

caused by pregnancy-related disabilities are functionally indistinguishable from the effects caused by any other disability: wages are lost due to a physical inability to work, and medical expenses are incurred for the delivery of the child and for postpartum care.[5]   In my view, by singling out for less favorable treatment a gender-linked disability peculiar to women, the State has created a double standard for disability compensation: a limitation is imposed upon the disabilities for which women workers may recover, while men receive full compensation for all disabilities suffered, including those that affect only or primarily their sex, such as prostatectomies, circumcision, hemophilia, and gout.   In effect, one set of rules is applied to females and another to males.   Such dissimilar treatment of men and women, on the basis of physical characteristics inextricably linked to one sex, inevitably constitutes sex discrimination.

The same conclusion has been reached by the Equal Employment Opportunity Commission, the federal agency charged with enforcement of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U. S. C. § 2000e et seq. (1970 ed., Supp. II), which prohibits employment discrimination on the basis of sex.   In guidelines issued pursuant to Title VII and designed to prohibit the dis-

---

[5] Nearly two-thirds of all women who work do so of necessity: either they are unmarried or their husbands earn less than $7,000 per year.   See United States Department of Labor, Women's Bureau, Why Women Work (rev. ed. 1972); United States Department of Labor, Employment Standards Administration, The Myth and the Reality (May 1974 rev.).   Moreover, this Court recognized in *Kahn* v. *Shevin*, 416 U. S. 351, 353 (1974), that "data compiled by the Women's Bureau of the United States Department of Labor show that in 1972 a woman working full time had a median income which was only 57.9% of the median for males—a figure actually six points lower than had been achieved in 1955." (Footnote omitted.)

parate treatment of pregnancy disabilities in the employment context,[6] the EEOC has declared:

> "Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. Written and unwritten employment policies and practices involving matters such as the commencement and duration of leave, the availability of extensions, the accrual of seniority and other benefits and privileges, reinstatement, and payment under any health or temporary disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 CFR § 1604.10 (b).[7]

In the past, when a legislative classification has turned on gender, the Court has justifiably applied a standard of judicial scrutiny more strict than that generally accorded economic or social welfare programs. Compare

---

[6] "The Commission carefully scrutinized both employer practices and their crucial impact on women for a substantial period of time and then issued its Guidelines after it became increasingly apparent that systematic and pervasive discrimination against women was frequently found in employers' denial of employment opportunity and benefits to women on the basis of the childbearing role, performed solely by women." Brief for United States Equal Employment Opportunity Commission as *Amicus Curiae* 10.

[7] See also the proposed Sex Discrimination Guidelines issued by the Department of Labor pursuant to Exec. Order 11246, virtually adopting the EEOC's pregnancy-related disabilities guideline, 38 Fed. Reg. 35337, 35338 (Dec. 27, 1973) (proposed 41 CFR § 60-20.3 (h)(2)).

*Reed* v. *Reed,* 404 U. S. 71 (1971), and *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), with *Dandridge* v. *Williams,* 397 U. S. 471 (1970), and *Jefferson* v. *Hackney,* 406 U. S. 535 (1972). Yet, by its decision today, the Court appears willing to abandon that higher standard of review without satisfactorily explaining what differentiates the gender-based classification employed in this case from those found unconstitutional in *Reed* and *Frontiero.* The Court's decision threatens to return men and women to a time when "traditional" equal protection analysis sustained legislative classifications that treated differently members of a particular sex solely because of their sex. See, *e. g., Muller* v. *Oregon,* 208 U. S. 412 (1908); *Goesaert* v. *Cleary,* 335 U. S. 464 (1948); *Hoyt* v. *Florida,* 368 U. S. 57 (1961).

I cannot join the Court's apparent retreat. I continue to adhere to my view that "classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny." *Frontiero* v. *Richardson, supra,* at 688. When, as in this case, the State employs a legislative classification that distinguishes between beneficiaries solely by reference to gender-linked disability risks, "[t]he Court is not . . . free to sustain the statute on the ground that it rationally promotes legitimate governmental interests; rather, such suspect classifications can be sustained only when the State bears the burden of demonstrating that the challenged legislation serves overriding or compelling interests that cannot be achieved either by a more carefully tailored legislative classification or by the use of feasible, less drastic means." *Kahn* v. *Shevin,* 416 U. S. 351, 357–358 (1974) (BRENNAN, J., dissenting).

The State has clearly failed to meet that burden in the present case. The essence of the State's justification for

excluding disabilities caused by a normal pregnancy from its disability compensation scheme is that covering such disabilities would be too costly. To be sure, as presently funded, inclusion of normal pregnancies "would be substantially more costly than the present program." [8] *Ante*, at 495. The present level of benefits for insured disabilities could not be maintained without increasing the employee contribution rate, raising or lifting the yearly contribution ceiling, or securing state subsidies. But whatever role such monetary considerations may play in traditional equal protection analysis, the State's interest in preserving the fiscal integrity of its disability insurance program simply cannot render the State's use of a suspect classification constitutional. For while "a State has a valid interest in preserving the fiscal integrity of its programs[,] . . . a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. . . . The saving of welfare costs cannot justify an otherwise invidious classification." *Shapiro* v. *Thompson*, 394 U. S. 618, 633 (1969). Thus, when a statutory classification is subject to strict judicial scrutiny, the State "must do more than show that denying [benefits to the excluded class] saves money." *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 263 (1974). See also *Graham* v. *Richardson*, 403 U. S. 365, 374–375 (1971).[9]

---

[8] However, "[i]t is important to remember, especially in the cost context, that if an employee is being paid his regular pay while disabled, he cannot collect disability pay. Therefore, it follows that any alleged financial burden on the State will be greatly diminished when employers adhere to Title VII and treat pregnancy-related disabilities the same as other disabilities by allowing women to use accumulated sick leave and possibly annual leave as well." Brief for United States Equal Employment Opportunity Commission as *Amicus Curiae* 21 n. 12.

[9] Similarly, under the EEOC's Guidelines on Discrimination Because of Sex, "[i]t shall not be a defense under title VIII to a charge

Moreover, California's legitimate interest in fiscal integrity could easily have been achieved through a variety of less drastic, sexually neutral means. As the District Court observed:

> "Even using [the State's] estimate of the cost of expanding the program to include pregnancy-related disabilities, however, it is clear that including these disabilities would not destroy the program. The increased costs could be accommodated quite easily by making reasonable changes in the contribution rate, the maximum benefits allowable, and the other variables affecting the solvency of the program. For example, the entire cost increase estimated by defendant could be met by requiring workers to contribute an additional amount of approximately .364 percent of their salary and increasing the maximum annual contribution to about $119." 359 F. Supp. 792, 798.

I would therefore affirm the judgment of the District Court.

---

of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other." 29 CFR § 1604.9 (e).