422 F.Supp. 124 (1976)
Barbara LEHOCKY, Plaintiff,
v.
The CURATORS OF the UNIVERSITY OF MISSOURI et al., Defendants.
No. 75-401C(2).
United States District Court, E. D. Missouri, E. D.
August 24, 1976.
Frank Susman, St. Louis, Mo., for plaintiff.
Jackson A. Wright, Columbia, Mo., for defendants.

MEMORANDUM OPINION
REGAN, District Judge.
This is a suit for a declaratory judgment respecting the constitutional validity of defendants' Medical Benefits Plan for its employees to the extent it provides no benefits, inter alia, for an elective or non-therapeutic abortion. Plaintiff also seeks judgment for damages in the sum of $150 and for attorneys' fees. The facts are not in dispute, and the parties have stipulated that the case may be submitted without a formal testimonial hearing.
Defendants, as curators of the University of Missouri, are a public corporation. At the times involved in this litigation, plaintiff was an employee at the Library of the University of Missouri, St. Louis campus. The medical benefits plan in question provides partial reimbursement to covered employees with respect to certain medical expenses. It is funded in part by contributions from participating employees and in part by contributions from defendants as employer.
As defined in the Plan, the term "covered medical expenses" excludes, among other items, any item of expense in connection with childbirth, Cesarean section, abortion or miscarriage, other than those resulting from medical or surgical complications. Thus, under the "covered medical expenses" portions of the Plan there is no provision for any reimbursement for medical expenses for either childbirth or abortion if there are no medical or surgical complications related thereto. There is no contention that this portion of the Plan is invalid.
Another portion of the Plan, entitled "Primary Pregnancy Benefit," has application only if both the female employee and her husband are covered under the plan and not then unless both have elected coverage under "Non-Reimbursable Costs No. 2." In *125 this case plaintiff and her husband (also an employee of the University) have so elected. Under the "Primary Pregnancy Benefit," when it is applicable, reimbursement is provided for expenses, up to a maximum of $150, incurred as a result of childbirth, miscarriage, non-elective, medically indicated Cesarean section and abdominal surgery for an extra-uterine pregnancy.
The parties have stipulated that the benefits and provisions of the Plan are a form of compensation and fringe benefit which defendants offer to their employees. It is further stipulated that the purpose and policy decision of defendants in establishing and offering the Medical Benefits Program to its employees is to select only those medical expenses to be covered and the percentage or maximum benefits payable for those expenses so as to provide, in the opinion of the defendants, the maximum benefit to its employees and their dependents in the areas where coverage is needed the most, all at the lowest and best contribution level affordable by all employees. The Plan does not purport to cover the full cost of all necessary or possible expenses.
The parties have also stipulated that in addition to the exclusion of an elective non-therapeutic abortion, the Medical Benefits Program will not pay for expenses incurred in connection with cosmetic surgery, unless due to an accident which occurred while the person was covered by the program, elective tubal ligation and vasectomy, routine physical examinations, routine immunizations, routine chest x-rays or blood tests, hair restoration for balding men, and vitamins and most non-prescription drugs.
It has further been stipulated that there is a greater potential cost when the risk of elective abortion is selected to be covered over selecting the medical procedures which are itemized under the Primary Pregnancy Benefit portion of the Plan. In this connection the parties have stipulated that there are more potential abortions in any year than deliveries, that a spontaneous miscarriage without complications may occur prior to delivery, that an elective abortion may be performed on a woman where a pregnancy is incorrectly diagnosed (whereas a non-pregnant woman will never incur the expenses of delivery), and that the woman may voluntarily decide not to take advantage of the Primary Pregnancy Benefit by electing to have an abortion which by the terms of the insurance policy is excluded from coverage.
On July 26, 1973, plaintiff underwent a medical termination of a then-existing pregnancy, a procedure commonly referred to as an abortion, her abortion being of the classification commonly known as elective or non-therapeutic. On November 18, 1974, approximately 16 months later, plaintiff made a request for reimbursement of $150 for medical expenses. The request for reimbursement was denied on the ground that an elective abortion was not covered under any provision of the Plan.
The sole issue, as presented by the parties, is whether the University of Missouri may exclude from coverage under its insurance-type Medical Benefits Plan all expenses incurred by a female employee for the voluntary, elective procedure of abortion without medical or surgical complications, although the Plan provides limited coverage to the maximum extent of $150 to female employees who incur medical expenses for childbirth.
In our consideration of the issue herein, we start with the landmark cases of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 1410, 35 L.Ed.2d 694 (1973). Roe held that a state statute making it a crime to cause or attempt an abortion except when necessary to save the life of the mother is violative of the Due Process Clause of the Fourteenth Amendment. Doe invalidated a statute which (in the language of Justice Douglas, concurring) erected a superstructure of medical supervision which violated "the patient's right of privacy inherent in her choice of her own physician."
The thrust of these decisions was that such statutes improperly invade a pregnant woman's right of personal privacy by their *126 absolute denial of her right to decide whether or not to terminate her pregnancy, at least in its early stages.
In essence (and at the risk of over-simplification) what Roe held was that a woman has a constitutional right to terminate her pregnancy during the first two trimesters. In the first trimester, the abortion decision and its effectuation are left to the medical judgment of the woman's attending physician, without interference or regulation by the State, while in the second trimester, the State is permitted to regulate the abortion procedure (but not the abortion decision) to the extent that such regulation reasonably relates to the preservation and protection of maternal health.
Plaintiff argues that by reason of the failure of the (insurance) Plan to include reimbursement for medical expenses which are incurred in connection with an elective non-therapeutic abortion, while at the same time providing reimbursement for similar expenses (up to a maximum of $150) for childbirth, the State (university) has thereby unduly "restricted" the rights of plaintiff in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.
Preliminarily, we note that plaintiff is concededly non-indigent and that the Plan itself was not designed to assist indigents. And unlike welfare benefits such as Medicaid, the Plan is not a creature of statute but rather is wholly contractual. It is, of course, true that the contract was drawn by the University and is administered by it. However, the Plan is purely voluntary, so that employees of the University may at their sole election either participate therein or decline to do so. So, too, employees who elect to participate in the Medical Benefits Program are not required to participate in the Maternity Benefits part thereof. If an employee elects to be covered by the Plan, the employee pays a prescribed contribution. The State is financially involved only to the extent that State (university) monies are used to pay the remaining portion of the cost thereof.
In general, the cases relied upon by plaintiff involve statutes or policy decisions which implement statutory policy decisions or pertain to publicly owned hospitals. None involve contracts. And, importantly, the overriding fact in most such cases is the indigency of plaintiffs. As in other areas of the law, the opinion in each case must be read in the context of the factual situation giving rise to the particular controversy. It is obvious that an indigent woman who desires to terminate her pregnancy is inhibited from doing so unless she is provided the necessary medical assistance. And it is equally obvious that if medical assistance or a hospital facility is afforded by the State only to those indigent women who carry their pregnancy to full term, the State is thereby directly interfering with and in fact preventing the indigent's freedom of choice. The result is to subject indigent women "to State coercion to bear children which they do not wish to bear."[1] On the other hand, no such problem is confronted by a non-indigent.
Under the specific facts of this case, it cannot reasonably be concluded that plaintiff's freedom of choice to choose between an abortion and a full-term child has been "unduly" or even significantly restricted. Cf. Doe v. Bolton, 410 U.S. 179 at 198, 93 S.Ct. 1410, 35 L.Ed.2d 694. And insofar as plaintiff herself is concerned, she makes no claim that the cost of the abortion had any bearing whatever in her personal decision to abort.
With full knowledge that the insurance contract (Plan) made no provision for reimbursement of any portion of the expenses of a non-therapeutic abortion, plaintiff nevertheless elected to undergo such an abortion in lieu of carrying her pregnancy to full *127 term. True, by deciding to abort plaintiff was denied the right to reimbursement in the sum of $150, a sum to which she would have been entitled had she carried her child to full term. However, we cannot believe that the decision of a non-indigent employee of the University as to whether she should undergo an abortion would reasonably be affected by her knowledge that medical expenses not to exceed the sum of $150 would be reimbursed in the one case and not in the other. This is particularly true in light of the known fact that the cost of bearing and rearing a child is astronomical as compared to the $150 for which reimbursement is sought in this case.
Arguing to the contrary, plaintiff states that "(i)t cannot be assumed that Medicaid assistance to an indigent is more critical in her decision to terminate a pregnancy than medical reimbursement [of up to $150] is to defendants' employees in their like decision making process." Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) and Cleveland Board of Education v. La Fleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 are cited in support of this argument. Stanley simply held that a statute which assumed as a matter of law that every unmarried father is unfit to raise his children denied the father due process of law, while La Fleur held that a school system could not conclusively presume for purposes of its mandatory maternity leave rules that every pregnant teacher is unable to continue teaching past a fixed pregnancy period or that she is not fit to resume work until after a specified period after delivery. Stanley and La Fleur are in no wise comparable to the present case, if for no other reason (and there are many others) than that the conclusive assumptions therein are not only demonstrably erroneous but operate of themselves and without any justification whatever to deprive fathers and female teachers of fundamental rights.
As noted supra, the Plan here involved is basically an insurance contract subsidized in part by contributions from State (university) funds. Nevertheless, contributions (or premiums) must be paid by those employees who elect to participate in the Plan. The Plan by its very nature is necessarily under-inclusive in order to keep the employee contributions within reasonable bounds.
We believe that the rationale of Geduldig v. Aiello, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256, supports the validity of the Plan. It is, of course, true that the disability plan in Geduldig was funded entirely through employee contributions and that there are other factual differences. One such difference is that participation in the University's Plan is purely voluntary whereas participation in the plan involved in Geduldig was essentially mandatory. Inasmuch as every benefit added to the coverage (and in particular abortions) will add to the potential cost, defendants could legitimately be concerned with keeping the employee contribution at the lowest possible level for those medical procedures of most utility to the greatest number of participants who wish limited coverage. Defendants could be concerned that the inclusion of the risk of elective abortions would increase the cost of the Plan not only to defendants but to those employees who did not desire such coverage, with resultant employee dissatisfaction and impairment of morale.
What plaintiff is seeking is payment for a benefit not covered by the insurance Plan (because the risk was not insured) and for which she paid no premium. That she was exercising a "fundamental right" in her abortion decision does not require the State (university) to provide plaintiff with cost-free insurance coverage therefor. We hold that defendants' insurance Plan is not violative of the Fourteenth Amendment or any other provision of the Constitution by its contractual exclusion of the risk of elective abortions from the insurance benefits payable thereunder to voluntary participants in the Plan. Accordingly, judgment will be entered in favor of defendants.
The foregoing memorandum opinion constitutes our findings of fact and conclusions of law.
NOTES
[1] In Doe v. Poelker, 515 F.2d 541, 544 (8 Cir. 1975), the Court stated "(t)he point" of that litigation as follows: Plaintiff "asks [only] that the city not deny her the equal protection of the law by interfering in her decision of whether to bear a child or have an abortion simply because she is indigent and unable to afford private treatment."