[DO NOT PUBLISH]                              `

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12187
_____

D.C. Docket No. 2:10-cv-03030-LSC


SANDI N. JOHNSON,

Plaintiff-Appellant,

versus

ALABAMA DEPARTMENT OF HUMAN RESOURCES,
a political sub-division of the State of Alabama,
ANGELA MCCLINTOCK,
in her official and individual capacity,
MICHELLE SHELTON,
in her official and individual capacity,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(November 19, 2013)

Before HULL and ANDERSON, Circuit Judges, and MOTZ,[*] District Judge.

PER CURIAM:

Plaintiff-appellant Sandi N. Johnson appeals the district court's award of summary judgment in favor of defendants-appellees the Alabama Department of Human Resources (the "ADHR"), Angela McClintock, and Michelle Shelton (collectively, "defendants").  Plaintiff Johnson filed § 1983 claims alleging gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.  After careful review of the record, and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

### A.    Johnson's May 2009 Hiring on Probation

In early 2009, plaintiff Johnson interviewed for the position of "Social Service Caseworker" with the Jefferson County, Alabama Department of Human Resources (the "JCDHR"), which is a subdivision of defendant the ADHR.  The ADHR is an arm of the state government.  The JCDHR hired Johnson on a probationary basis and Johnson started work on May 11, 2009.  During March 2009, Johnson learned that she was pregnant.

### B.    Johnson's 12 Weeks of Training

---

[*]Honorable J. Frederick Motz, United States District Judge for the District of Maryland, sitting by designation.

On May 11, Johnson first reported to work and signed paperwork including a form stating her agreement to read and follow the policies in the ADHR employee handbook. The handbook informed Johnson that the JCDHR "may separate a probationary employee at any time by giving written notice to the employee outlining the reasons for separation." Johnson acknowledged that, on her first day, a JCDHR official told her that she was a probationary employee.

Johnson then began the JCDHR's 12-week training course, consisting of eight weeks of classroom instruction and four weeks of supervised field work.

## C.    Johnson's Poor Work for the ADHR

After her training, around September 1, 2009, Johnson reported to defendant Michelle Shelton, her supervisor in the Child Abuse and Neglect Unit. Shelton gave Johnson a written work plan. Johnson described her work plan as follows: "first week, turn in I think one case; second week, turn in, I believe, like two cases. Third week, maybe two cases and the fourth week, two or three cases." Johnson admitted that she "didn't turn in any cases the fourth week." Johnson thus failed to comply with her work plan for that week.

Other problems existed with Johnson's work performance during September. Defendant Shelton stated that: (1) Johnson failed to comply with office policy requiring caseworkers to contact potential child abuse victims within 48 hours of a report of abuse; (2) Shelton "had to tell Ms. Johnson several times to start the

3

attempt on a particular case"; and (3) Johnson had "lack [of] productivity and is frequently in other worker's office socializing."

### D.    Shelton's September 28, 2009 Meeting with Johnson

Accordingly, on or about September 28, 2009, Shelton met with Johnson. Shelton described the meeting, stating that she "met with Ms. Johnson . . . to discuss her failure to close cases, transfer cases timely and properly attempt first victim contacts." Johnson did not dispute this general description of Shelton's meeting with her.

Johnson acknowledged the report that she was "socializing" with other workers too often. Johnson said, "there were some workers next door to me. There was a season worker. She had been there for a long time. . . . And I would go over there and I would discuss a case with her." Johnson admitted that, a few days before the September 28, 2009 meeting, Shelton had told her to "get out of [the co-worker's] office."

### E.    The Decision to Terminate Johnson

The next day, Shelton shared her concerns about Johnson's work performance—Johnson's failure to comply with her work plan, her inability to commence investigations, and her excessive socializing—with defendant Angela McClintock, Shelton's supervisor. McClintock passed these concerns on to her supervisor, Darlene Poole, writing: "We have a new worker: Sandi Johnson that is

4

just not making it . . . . The other new ones are getting things turned in weekly, she is not. . . . Can we just go ahead and let her go this week? Before she goes on full rotation?" Poole instructed McClintock to "meet with [Johnson] Friday and give her the option to resign," and McClintock agreed to do so.

## F.    Complaint about Johnson's Demeanor

Before McClintock's Friday, October 2 meeting with Johnson, another important event occurred. Around the end of September 2009, the Child Abuse and Neglect Unit "received a written letter of complaint from a participant in an open case of Sandi Johnson's." The complainant was an individual suspected of child abuse. When Johnson learned that the subject of one of her investigations had complained about her, Johnson contacted the complainant.

According to Shelton, Johnson "called the complainant on the telephone and cursed and yelled at the complainant about the letter that was written." Shelton stated that "[t]he complainant reported that afterwards, Ms. Johnson hung up the telephone in his face." Johnson admitted that this incident occurred and that she "did disconnect the call because [the complainant] was upset." Johnson denied getting loud and cursing.

## G.    Johnson's Termination

On Friday, October 2, McClintock and Shelton met with Johnson. During that meeting, McClintock "let Ms. Johnson know that we would not be

5

recommending her for permanent status based on her job performance." McClintock "explained to Ms. Johnson that she was not meeting the requirements of her job and that she was not being recommended for permanent status based on the deficiencies mentioned above."

McClintock averred that Johnson became "extremely belligerent, yelling, crying, and accusatory" and called Shelton "evil and a cold hearted liar." McClintock averred "[a]t the end of the meeting, Ms. Johnson looked at Ms. Shelton and stated 'I am not threatening you (she then looked at me) or you; but you need to know that what goes around, comes around and this will come around.'" Johnson did not remember "yelling" but did remember crying. She also stated: "I don't recall calling her cold-hearted. I did say what goes around comes around. I did say that."

Later that day, Johnson submitted a signed resignation letter, but stating: (1) that she was fired "due to unfair allegations"; (2) that she was "not given an opportunity to defend" herself; and (3) that the "allegations stemmed from obvious vengeance" that Shelton had towards her. Johnson's resignation letter did not allege any comments about her pregnancy. Subsequently, Johnson withdrew her resignation letter and was terminated.

After terminating Johnson, McClintock and Shelton filled out an "Employee Performance Probationary" form, which stated that Johnson was "[s]eparated

6

before or at the end of the probationary period." The probation form listed Johnson's job responsibilities and scored her work performance. These scores resulted in a raw combined score of 16.66 on a 40-point scale, which rounded up to 16.7.

## H.    Alleged Pregnancy-Related Comments

Johnson does not deny her probationary status or that Shelton and McClintock told her the above reasons for her termination. Rather, Johnson contends that defendants Shelton and McClintock each made one discriminatory comment about Johnson's being pregnant. These alleged comments are the basis for Johnson's claims here.

As for defendant Shelton, Johnson testified that, when she first reported to the Child Abuse and Neglect Unit, Shelton said "oh no, they sent me another pregnant lady."[1]

As for defendant McClintock, Johnson stated that, during the October 2, 2009 termination meeting, McClintock said, "We just have some concern about your pregnancy. We feel the job is too stressful and fast paced for you. Due to your pregnancy, you cannot handle it." Johnson testified that McClintock "stated that as the assistant director, she has to do what's best for her Department, and

---

[1]In a declaration, Johnson described this comment slightly differently, stating: "When I reported to the CAN section one of the supervisors who was to be in authority over me [Michelle Shelton] remarked 'oh no, they did not send me another pregnant one.'"

7

because I was going on maternity leave soon, that it would be best for them not to, you know, place me into permanent status or continue my employment." McClintock expressly denied making these statements.

After Johnson filed an EEOC charge where she first alleged pregnancy discrimination in her termination, McClintock wrote an email stating: "[b]eing pregnant has nothing to do with" a person's ability to do the job of caseworker.  In her declaration, McClintock pointed out that "[d]uring the same time frame that Johnson worked, I had three other CAN staff members who were pregnant.  Both worked very well and performed their job duties until they left on maternity leave."

Furthermore, McClintock noted that in an email written immediately after Johnson first alleged pregnancy discrimination, McClintock stated: "[b]eing pregnant has nothing to do with" a person's ability to do the job of caseworker."

## II.  PROCEDURAL HISTORY

**A.    Johnson's Earlier Title VII Action**

After receiving a right to sue letter, Johnson, filed a <u>pro se</u> complaint under Title VII against the JCDHR and the State of Alabama in the Northern District of Alabama.[2]  Johnson's complaint alleged that she "was discriminated against due to my pregnancy."

---

[2]Johnson did not specifically state that she was bringing Title VII claims; however, the parties in this action stipulated that Johnson's earlier <u>pro se</u> complaint alleged a Title VII claim.

8

The district court granted Johnson <u>in forma pauperis</u> status and instructed her to file an amended complaint within 30 days. After Johnson failed to do so, the district court dismissed the case. The district court also denied Johnson's counseled Rule 60(b) motion for reconsideration and motion for leave to file an amended complaint.

**B.    Johnson's Complaint in this Case and Summary Judgment**

Subsequently, Johnson, still represented by counsel, commenced this § 1983 action against defendants the ADHR, and McClintock and Shelton (in their official and individual capacities). The complaint alleged that the defendants "discriminated against Plaintiff based on her sex and the fact she was pregnant in violation of the Equal Protection Clause of the Fourteenth Amendment." After discovery, the defendants filed a motion for summary judgment, which the district court granted.[3]

## III.  DISCUSSION

**A.    <u>Res Judicata</u> Analysis**

---

[3]We review a district court's award of summary judgment <u>de novo</u>, viewing the evidence in the light most favorable to the non-moving party. <u>Alvarez v. Royal Atl. Developers, Inc.</u>, 610 F.3d 1253, 1263–64 (11th Cir. 2010). "Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Hamilton v. Southland Christian Sch., Inc.</u>, 680 F.3d 1316, 1318 (11th Cir. 2012) (internal quotation marks omitted).

We consider the res judicata effect of Johnson's earlier Title VII action.  The doctrine of res judicata "bars the filing of claims which were raised or could have been raised in an earlier proceeding."  Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999).  Res judicata applies when: "(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases."  Id.

Each element is satisfied.  First, the district court's dismissal of Johnson's Title VII complaint for failure to prosecute was a "final judgment on the merits." See Costello v. United States, 365 U.S. 265, 286–87, 81 S. Ct. 534, 545 (1961) (explaining that "a sua sponte dismissal by the Court for failure of the plaintiff to comply with an order of the Court" constitutes "a bar to another suit").  Second, the dismissal of the Title VII action was rendered by a court of competent jurisdiction.  Third, privity exists between the defendants in the Title VII case—the JCDHR and the state of Alabama—and some defendants here.  The JCDHR and the ADHR are both state government agencies or sub-agencies.  As for privity between the JCDHR and McClintock and Shelton in their official capacities, "a government official sued in his or her official capacity is considered to be in privity with the government."  Lozman v. City of Riviera Beach, Fla., 713 F.3d 1066, 1075 n.7 (11th Cir. 2013).  Privity, however, was lacking between the

10

defendants in the Title VII case and McClintock and Shelton in their individual capacities.  Fourth, the same cause of action was involved in both cases because both arise "out of the same nucleus of operative fact" and are "based upon the same factual predicate."  See Ragsdale, 193 F.3d at 1239 (internal quotation marks omitted).

Thus, res judicata bars Johnson's claims against the official defendants here—the ADHR, and McClintock and Shelton in their official capacities.  Res judicata does not bar Johnson's claims against McClintock and Shelton individually.  We proceed to consider the merits of those claims.

## B.    Gender Discrimination Claims Under the Equal Protection Clause

"In any 1983 action, a court must determine whether the plaintiff has been deprived of a right secured by the Constitution and laws of the United States." Glenn v. Brumby, 663 F.3d 1312, 1315 (11th Cir. 2011) (internal quotation marks omitted).  Thus, this case causes us to consider whether Johnson's termination violated the Equal Protection Clause of the Fourteenth Amendment.  See id.

Title VII expressly prohibits discrimination based on sex and "on the basis of pregnancy."  See 42 U.S.C. §§ 2000e(k), 2000e-2(a)(1).  The Equal Protection Clause, however, subjects classifications based on gender to heightened scrutiny. See Geduldig v. Aiello, 417 U.S. 484, 496 n.20, 94 S. Ct. 2485, 2492 n.20 (1974).

11

Nonetheless, certain stereotyped remarks about pregnancy can be evidence of gender-based discrimination.  Id.

Here, Johnson contends that the two comments (one by McClintock and one by Shelton) are evidence of gender discrimination.  In response, the defendants argue that, even if the comments did occur, the pregnancy comments related only to Johnson's personal medical condition and not to her gender.  The defendants stressed both McClintock and Shelton are female, they had other pregnant female employees, and other than the alleged comments, there was no evidence in the record of Johnson's being treated differently from other male or female workers due to her pregnancy.

We need not decide whether the comments here about pregnancy constitute gender discrimination.  To the extent that McClintock's and Shelton's comments can be viewed as evidence of gender discrimination, they are certainly very weak evidence at best.  Assuming that the statements occurred as alleged, they did not show a pattern of gender stereotyping.  Rather, Johnson's evidence showed only two comments over her approximately five months of probationary employment.[4]

_____

[4]Although, at this summary judgment stage, we view the record in the light most favorable to Johnson and assume that the comments occurred as she described, we stress that strong circumstantial evidence in the record contradicts Johnson's story, including: (1) Johnson was pregnant when she started work; (2) Johnson already had a child at that time; (3) Johnson encountered no discrimination during her training period; (4) Johnson did not mention any pregnancy-related reason for termination in her resignation letter, although, in that letter, she offered other nefarious reasons for being fired; and (5) neither defendant ever mentioned pregnancy in any written document pertaining to Johnson.

Moreover, on this record, McClintock and Shelton showed legitimate persuasive justifications for their action in terminating Johnson at the end of her probation period.

Specifically, there was ample, undisputed evidence in the record showing that Johnson was ineffective at her job. Johnson did not comply with the requirements of her work plan when she failed to complete just two investigations during her fourth week. Johnson socialized with another employee during work hours, and her supervisor, Shelton, admonished her about this. Even though Johnson's tenure was short, a private citizen had already filed a complaint against Johnson and Johnson had contacted that citizen on the telephone and had a verbal altercation and hung up on the citizen. The timing of that citizen complaint was important because it was right before McClintock and Shelton were scrutinizing Johnson's work on probation to decide whether to make her a permanent employee.

Because the record amply established a "sufficiently important governmental interest" for terminating Johnson, we cannot say the district court erred in awarding summary judgment to defendants McClintock and Shelton, in their individual capacities.

## IV.  CONCLUSION

13

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**