Willie Mae PAYNE et al., Plaintiffs,

v.

TRAVENOL LABORATORIES, INC., et al., Defendants.

No. DC 72–13–S.

United States District Court, N. D. Mississippi, Delta Division.

Feb. 19, 1976.

Richard T. Seymour, Washington, D.C., Nausead Stewart, Anderson, Banks, Nichols & Stewart, Jackson, Miss., for plaintiffs.

James L. Robertson, Campbell & DeLong, Greenville, Miss., Stephen N. Shulman, Cadwalader, Wickersham & Taft, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

Following a two-week bench trial, this employment discrimination action is now before the court for decision on the merits.

The suit was commenced March 2, 1972, by the filing of complaint by three individual plaintiffs seeking to represent a class of persons allegedly subjected to racial discrimination at the hands of the defendants. The scope of the plaintiff class was subsequently broadened by the addition of allegations of sex discrimination. Of the original named plaintiffs, one was a black, male employee at defendants' Cleveland, Mississippi, facility and two were black, female applicants for employment at the defendant's Cleveland plant.

Defendants in the case are Travenol Laboratories, Inc., and Baxter Laboratories, Inc. Because Travenol is a wholly-owned subsidiary of Baxter, the court will make no attempt to differentiate between the defendants and will refer to them indiscriminately as "Travenol", "Baxter", or simply "the defendants".

The course to trial and determination on the merits was long and arduous. During

the months following the filing of complaint, the court was required to rule upon a motion to strike jury demand (which was granted), a motion to certify as a class action (which was granted), a motion to dismiss and/or for summary judgment (which was denied), a motion for a preliminary injunction (which was denied) and various other motions concerning discovery and the substitution of parties. On or about November 15, 1973, counsel approached the court and requested proceedings in the case be held in abeyance pending the outcome of settlement negotiations. Negotiations dragged on until June of 1974, at which time they collapsed.

During the summer of 1974, the parties resumed vigorous discovery. The court bifurcated the trial of the case, deferring consideration of the appropriate relief to be afforded plaintiffs, if any, until after the court had determined if defendants' conduct about which plaintiffs complained is or was in contravention of Title VII of the Civil Rights Act of 1964.[1] The liability portion of the trial began March 3, 1975, and concluded March 14, 1975. However, the end of the trial unfortunately did not mark the end of the litigation of the matter of liability. Voluminous and time-consuming post-trial motions filed on behalf of both plaintiffs and defendants required disposition by the court prior to consideration of the merits.

In the course of the three-year period between filing of complaint and commencement of trial, the cast of the named plaintiffs changed substantially. Two of the original named plaintiffs, James Williams and Alma Jean Williams, sought and received permission of the court to withdraw as parties. Willie Mae Payne remains the

only original named plaintiff in the lawsuit. In 1973, the court sustained a motion for leave to intervene filed on behalf of Delilah Cherry and Birdie Griffin. Thereafter, the case proceeded to trial with Ms. Payne, Ms. Cherry, Ms. Griffin, and the class which they represent opposing the defendants, Travenol and Baxter.

Although she has since moved to Chicago, Illinois, Willie Mae Payne was, at the times pertinent to the issues now before the court for determination, a black female resident of the Cleveland, Mississippi area in which the defendants' facility is located. There was some controversy as to when Ms. Payne initially applied for employment at the Baxter plant; however, the parties have stipulated that she did so at least as early as March 17, 1970. Although Ms. Payne has no more than seven years of formal schooling, she obtained a tenth grade rating on the General Educational Development (GED) test on January 19, 1970. Ms. Payne was never hired by the defendants.

Delilah Cherry is a black female resident of the Cleveland, Mississippi area. At the time Ms. Cherry claims she was subjected to discrimination at the hands of the defendants, she had completed only eight years of formal education and had obtained a certificate of tenth grade equivalency on a GED test in 1967. Although she initially sought employment at the Baxter plant at least as early as 1970,[2] Ms. Cherry had no success in obtaining a job with the defendants until some time after the institution of the instant litigation. She is presently employed by the defendants.

There was a degree of confusion as to the facts surrounding the claim of plaintiff Birdie Lee Griffin. Prior to trial, counsel stipulated as to certain facts concerning Ms.

---

1. 42 U.S.C. § 2000e *et seq.*

2. As will be discussed in greater detail *infra*, until November 5, 1971, the personnel department at Travenol would consider job applications only from persons who were referred to them from the local office of the state employment service. The attempts of Ms. Cherry and Ms. Payne to secure employment at Travenol were initially thwarted by the refusal of the

employment service to refer plaintiffs to defendants. Ms. Payne and Ms. Griffin went to the state employment office initially to seek employment at Travenol. Ms. Cherry went directly to Travenol in the first instance but was instructed that defendants hired only employment service referrals. The plaintiffs were ultimately referred to Travenol, but only Ms. Cherry was successful in obtaining employment.

Griffin. When Ms. Griffin testified at the trial, it developed from her testimony that the Birdie Lee Griffin who was the subject of the stipulations was the daughter and namesake of the Birdie Lee Griffin who was a witness and party in this cause. Accordingly, the facts set forth in the stipulations as to Ms. Griffin have no application to this lawsuit.

The correct facts, as the court finds them to be from her testimony at trial, are that Birdie Lee Griffin is a forty-eight year old black woman currently residing in the Cleveland, Mississippi area. Ms. Griffin completed eleven years of formal education and has attained a twelfth-grade equivalency on the GED. Ms. Griffin first applied for a job with Travenol in 1966. Although she was referred to Baxter by Mississippi State Employment Service (MSES), Ms. Griffin was never offered a job at the Cleveland plant.

Each of the named plaintiffs filed discrimination charges with the Equal Employment Opportunity Commission (EEOC). Ms. Payne lodged two charges, one each in February and March of 1970. Named as respondents in these charges were Baxter Laboratories and MSES. These charges related primarily to Travenol's education requirement, the use of MSES as an exclusive source of applicants, and claims of racial discrimination. The EEOC investigated Ms. Payne's allegations and, on March 15, 1971, issued findings of fact to the effect that reasonable cause existed to believe that Baxter's practices resulted in discrimination against blacks substantially as alleged by Ms. Payne. A right to sue letter was issued Ms. Payne on December 28, 1971, as to MSES, and on September 6, 1972, as to Baxter.

Ms. Cherry also filed two charges with the EEOC naming Baxter and MSES as respondents. The first charge, lodged August 14, 1970, inferred that white job applicants at the Travenol plant were preferred to black. The second charge, signed by Ms.

Cherry on January 12, 1971, contained only the simple allegation that Travenol refused to hire Ms. Cherry because she is black. The EEOC investigation conducted in response to Ms. Cherry's charges resulted in a finding that reasonable cause existed to believe Travenol was then engaged in unlawful employment practices. This finding was based almost entirely upon Travenol's requirement that each job applicant possess at least a tenth grade education or an equivalent score on the GED test. A right to sue letter was issued to the attorney for Ms. Cherry by EEOC on June 6, 1973.

Ms. Griffin filed two charges against Baxter with the EEOC. The first was received by the Commission on August 28, 1970, and the second was executed by Ms. Griffin on January 12, 1971. Both of Ms. Griffin's charges related to racial discrimination. She received a right to sue letter, through her attorney, from EEOC on June 6, 1973.

In their complaint, plaintiffs sought injunctive relief and damages in the nature of back-pay to remedy what they allege is defendants' past, present, and future discrimination against blacks and women. Plaintiffs maintain that the defendants' use of the tenth grade education requirement violates Title VII insomuch as the requirement has a distinctly disparate effect on blacks in the Cleveland, Mississippi area and cannot be justified as a business necessity. Plaintiffs also attack what they claim was defendants' practice of restricting the better-paying jobs to male employees. In conjunction with this allegation, plaintiffs maintain that the preservation of separate seniority rosters in the two classifications of defendants' production-line workers[3] discourages inter-job transfers and perpetuates the effects of past discrimination. Plaintiffs also included in the complaint a charge that the manner in which Travenol management hires and promotes its clerical and professional staff unlawfully discriminates against blacks.

---

3. As will be discussed in greater detail *infra*, Travenol groups its production line workers into "assemblers" and "material handlers".

The proof in the case shows that material handlers are substantially better paid than assemblers.

As was indicated earlier, the court certified this action as one which may be maintained on behalf of a plaintiff class as required in Fed.R.Civ.P. 23(c) and tentatively defined the class as follows:

All present, past, and future black female employees and all present, past, and future black female applicants for employment at the facility operated by the defendants at Cleveland, Mississippi, subject, however, to this limitation, that is to say, all black female applicants for employment at said facility prior to March 3, 1970, and all black female employees whose employment terminated prior to March 3, 1970, are excluded from the class; the class shall be subject to the further limitation that all black female applicants who lack a tenth grade education or equivalency or who were not referred for employment at the Cleveland facility by the Mississippi State Employment Service during the period such referral was required, are excluded from the class.

Although perhaps not strictly necessary, the court deemed it desirable that, pursuant to Fed.R.Civ.P. 23(c)(2), notice be furnished members of the above-defined class. The notice was through the mail to those whose identities were known to plaintiffs' counsel, and through publication to those unknown to counsel. It appears that approximately 1300 class members received notice of the pendency of the action through the mailing. Because some of the responses to the notice evince as apparent misunderstanding as to the basic nature of the matter, both plaintiffs and defendants moved the court to require some additional or supplemental notice to prospective class members. Defendants sought to have the court modify the class notice from the "opt-out" to the "opt-in" form. Plaintiffs requested a "clarifying notice" be sent to each of the approximately 400 members of the plaintiff class who had responded to the court's original notice by seeking exclusion from the class. The court determined to follow neither course proposed by counsel but, instead, entered an order deferring consideration of the advisability of requiring an additional class notice until such times as the question of the defendants' liability has been resolved.

## RACE DISCRIMINATION

Baxter's involvement in Mississippi began in 1950, when, pursuant to a legislative program of the State of Mississippi designed to encourage the immigration of industries into the state (Balance Agriculture With Industry—BAWI), the defendants established a facility in Cleveland, Mississippi. Construction and periodic expansion of the Cleveland plant was financed in part through bonds issued by the City of Cleveland under the BAWI program. Approval by the city voters was a prerequisite to participation in the BAWI program. A good relationship between Travenol management and employees and the political, economic, and social leaders of the community was therefore essential to the successful operation of the Travenol plant in Cleveland.

From the commencement of operations in 1950, the defendants' Cleveland plant has manufactured, processed, packaged, and distributed drug and pharmaceutical products, with an emphasis on parenteral fluids and intravenous solutions. These products are used by hospital and medical facilities throughout the Mid-South.

Travenol's products are packaged and labelled on an assembly line along which the bottles are filled with various solutions. Production line workers are referred to as "assemblers". Assembler positions by and large involve the filling, capping, labelling, and inspection of bottles as they move along the production line. A second type of production line worker is known as a "material handler". The material handler job consists primarily of coordinating the flow of materials along the assembly line and the distribution of materials to various work stations along the line in accordance with production schedules.

Of the approximately 1200 persons employed at the Travenol plant in Cleveland,

some 900 occupy either assembler or material handler positions.

The employment practices attacked in the complaint have evolved since defendants' Cleveland facility began operation in July of 1950. From 1950 until 1966, Mr. Olin Taylor was employed as personnel manager at the plant. During this period, he personally hired all custodians, material handlers, and assemblers. During his tenure as personnel manager, Mr. Taylor received no written instructions from Baxter management as to the standards which he was to employ in deciding which applicants to hire. His decisions were based mainly upon subjective factors and community references or recommendations played an important role in the hiring process. The most frequent source of references and recommendations was the industrial development committee of the Cleveland Chamber of Commerce. There were no blacks on this committee during the periods when it made references or recommendations. References were given heavy emphasis until the late 1950's or early 1960's, at which time their importance began to decline.

When Mr. Taylor began to rely less upon community references and recommendations in the late 1950's or early 1960's, he concurrently began to rely more heavily upon his own subjective judgment in determining whether to accept an applicant for employment. One of these subjective factors was Mr. Taylor's belief that close relatives of an employee with a good record would likely be good employees and, conversely, close relatives of an employee with a poor work record would likely be poor employees.

Prior to 1964, the defendant's work force was composed entirely of whites except for custodial or janitorial jobs. This exclusion of blacks from noncustodial jobs was based in part upon conformity to local racial traditions.

At some point during 1964, and subsequent to the passage of Title VII, Mr. Taylor requested the Cleveland office of MSES to perform a survey of the noncustodial jobs at the Travenol plant and to recommend changes or alterations to the hiring process which would bring blacks into non-custodial positions and jobs as operatives on the production line. Following their study, MSES recommended that the defendants impose a requirement that prospective applicants possess at least a twelfth grade education. Mr. Taylor rejected this recommendation as too restrictive and, instead, Travenol adopted a tenth grade standard for prospective employees. A tenth grade GED equivalency would also satisfy this requirement.

At the time of the imposition of the tenth grade requirement, February of 1965, Travenol employed four blacks as material handlers. Each had been promoted from a custodial position to a position on the production line. The defendants had not, prior to 1965, initially hired any blacks as operatives.

In February 1965, Mr. Taylor determined to use MSES as the exclusive referral source for applicants for assembler and material handler positions at the Travenol plant. Prospective employees directly contacting the personnel office at the plant were instructed to report to the MSES office to initiate the application process, inasmuch as the personnel department would not consider an applicant not referred by the Cleveland office of MSES.

Prospective employees satisfying the MSES standards, including the tenth grade requirement, were referred to the Travenol plant for an interview with Mr. Taylor. The impression which Taylor gained at this interview, coupled with the recommendation of plant employees, determined the applicant's success or failure in landing a job with Travenol. Between 1965 and 1971, the defendants customarily contacted one of their black employees, Julius Lucas, to ascertain his opinion of prospective black employees.

In 1967, Mr. Taylor was succeeded as personnel manager by James K. Lesley. Mr. Taylor supplied Mr. Lesley with the names of persons in the local community who could serve as references for job appli-

cants. Lesley's tenure with Travenol was brief, terminating in April 1968. Mr. Lesley was succeeded as personnel manager by James E. Self on July 15, 1968. Mr. Taylor, who was still in defendant's employ, did not give Mr. Self instructions as to how to conduct interviews with applicants since he considered Mr. Self's background in personnel matters sufficient for performance of the duties of personnel manager at the plant. Mr. Self served as personnel manager at the Cleveland plant from July 15, 1968 to August 31, 1974.

During Mr. Self's tenure, hiring decisions as to persons referred by MSES were based primarily on subjective factors. The qualifications considered included personal cleanliness, general alertness, and comprehension. The personnel manager did not have one set of interview questions which he used in each and every interview, the questions asked varied among the applicants.

Although Travenol abandoned its policy requiring that all applicants for jobs as operatives be referred by MSES in the Fall of 1971,[4] it has continued in effect the Tenth grade education requirement for operatives on the production line.

The greater portion of the evidence offered at the trial, including expert testimony, tables, and statistical displays, was addressed to the issue of the effect of the tenth grade education requirement. Statistics of all kind and expert analysis of statistical evidence ad infinitum were received into evidence. The voluminous nature of the documentary evidence thus introduced, as well as counsels' heated debate as to the proper interpretation of each item in evidence tended to confuse rather than enlighten. To engage in an extensive discussion of the evidence in this regard would result in an opinion beyond all reasonable bounds. Accordingly, the court's discussion of the issue will be brief and to some extent conclusory.

4. In response to information received by defendants' attorneys to the effect that a lawsuit would soon be initiated charging that MSES's Cleveland office referred job applicants in a

## RACIAL EFFECT OF TENTH GRADE EDUCATION REQUIREMENT

Lamentations aside, it falls to the court to determine, in reverse order, whether the defendants' educational requirement has been "shown to be significantly related to successful job performance" and whether the requirement "operate[s] to disqualify Negroes at a substantially higher rate than white applicants". *Griggs v. Duke Power Co.*, 401 U.S. 424, 426, 91 S.Ct. 849, 851, 28 L.Ed.2d 158, 161 (1971).

Because there are no available U. S. Census Bureau figures showing the number of blacks and whites in Mississippi with ten or more years of education, the parties stipulated that the relative racial effect of the tenth grade requirement used by defendants is as great as the relative effect of a ninth grade requirement. Using the ninth grade figures, the 1970 census report for the State of Mississippi clearly shows the education requirement has a substantially disproportionate adverse effect upon blacks. In the county in which defendant's plant is located, for example, 81.6% of the black males in the county over 25 years of age had less than 9 years of education. Of the black females in the county over 25, 72.9% had fewer than 9 years of education. The comparable figures for whites were 29.6% for males and 20.8% for females.

Defendants' only attempt to blunt the effect of the Census Bureau figures was to speculate that the educational gap between blacks and whites would be considerably narrower if figures were available which included GED equivalencies in addition to formal education. No concrete proof was offered in support of this contention and the court is not inclined to believe, absent some showing, that blacks would avail themselves of the GED program to a greater extent than whites in numbers so large as to significantly reduce the great disparity apparent in the Census Bureau figures. Considering all the evidence, the court has

racially discriminatory manner, defendants notified MSES on November 5, 1971, that Travenol would no longer utilize the services of MSES.

concluded that plaintiffs have shown in a most convincing manner that Travenol's tenth grade or equivalency requirement disqualifies substantially more black applicants than white.

■ As might be expected, the majority of proof introduced by defendants was in support of their assertion that the nature of the product manufactured by them at their Cleveland plant dictates a literate and alert work force, a condition which can be assured only through use of a screening process which includes the tenth grade education requirement. Simply stated, defendants claim the requirement is a business necessity. In the opinion of the court, the proof in the case shows otherwise.

Assemblers and material handlers work from place to place on the production line and must be familiar with each job involved. They are required, at times, to keep records and to add, subtract, and multiply. They must be alert, attentive, flexible and must be able to read, with an understanding of what they have read, and to follow instructions. Generally, material handlers and assemblers learn their respective duties from on-the-job training. The parties stipulated that the operative positions do not require any particular sort of previous employment on the part of the incumbent.

It is defendants' position that the high speed of the production line on which the bottles are filled with the intravenous solutions requires a particular alertness and attentiveness on the part of the employee assigned to line operations. Decisions affecting quality must be made quickly as the production line progresses. Accordingly, defendants maintain that operatives must possess sound judgment in order to appreciate the potential consequences of their actions.

Because of the nature of their product and its intimate effect on human life, Travenol management has made every attempt to build quality control consciousness into each job at the plant. The potentiality for disaster inherent in a mislabelled product in the drug industry dictates use of the tenth grade requirement as a necessary and effective screening device for the selection of competent employees, so defendants argue. Turning again to *Griggs*, the court finds the following language from that opinion highly instructive on this point:

"Nothing in [Title VII] precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract." 401 U.S. at 436, 91 S.Ct. at 856, 28 L.Ed.2d at 167.

After a full consideration of all of the evidence on the issue, the court is of the opinion, and so holds, that Travenol's tenth grade educational requirement does not measure the person for the operative job at its Cleveland plant.

Every condition of liability set forth by the Court in *Griggs* is to be found in this case. That is, the operative jobs at defendants' plant were reserved exclusively for and occupied exclusively by whites prior to passage of Title VII. The education requirement without question has a substantially more adverse effect upon black applicants than upon white applicants. And, from a familiarity with the nature of the operative jobs at the Travenol plant acquired through two weeks of hearings on the matter, the court is convinced the educational requirement has not been "shown to be *significantly* related to successful job performance." *Griggs, supra,* 401 U.S. at 426, 91 S.Ct. at 851, 28 L.Ed.2d at 161 [emphasis added].

In concluding that the education requirement is not job related, the court considers

it highly pertinent that the standard was not adopted until the defendants began desegregating their work force in order to comply with the Civil Rights Act of 1964. *United States v. Georgia Power Co.*, 474 F.2d 906, 912 (5th Cir. 1973).[5] Although the Cleveland plant had operated successfully for more than fifteen years without an educational policy of any sort in regard to the employment process, in 1965 Travenol determined to establish the tenth grade requirement for all noncustodial jobs, including the assembler and material handler positions which make up more than three quarters of Travenol's entire work force.

The court is also assisted in reaching a decision on the legality of defendants' education requirement by consideration of the EEOC's own guidelines concerning educational prerequisites for employment.[6] Application of the EEOC's interpretation of Title VII to the facts in the case at bar, as the court finds them to be, likewise compels a holding that use of the tenth grade requirement constitutes unlawful discrimination against black applicants or prospective black applicants at defendants' Cleveland facility. 29 C.F.R. § 1607.1 *et seq.*

█ The court's holding is not to be interpreted as precluding defendants from adopting methods of testing or other measuring procedures to predict an applicant's ability to effectively perform the duties of an operative at defendants' plant. The court appreciates the fact that personnel assigned to these positions must be able to read with some degree of comprehension and be capable of performing certain mathematical calculations. However, where, as here, the crude benchmark selected by an employer to insure employees possess the ability to read and write and add and subtract operates to substantially and dispro-portionately burden minority applicants and has been shown to relate to job performance in only the most remote sense, use of that benchmark is proscribed by Title VII.

## THE OVERALL EFFECT OF DEFENDANTS' HIRING PRACTICES FOR OPERATIVE POSITIONS

The record reflects that once an applicant for an operative job at Travenol has hurdled the tenth grade barrier, the hiring decision is based primarily on subjective factors. These job decisions are made by defendants' personnel managers without written instructions or directives from corporate headquarters. Among applicants for these positions who met the requirement of referral by MSES while it was in effect, the defendant hired proportionately fewer blacks. Defendants' records reflect that for the period from April, 1971 through August, 1974, one of every three white applicants for operative positions at Travenol was hired, but only one of every six black applicants was hired. This disparate result reflects the combined effect of a tenth grade requirement and of the defendants' subjective discrimination.

The defendants' records indicate that in May, 1964, all operatives were of the white race. By March of 1966, more than a year after the implementation of the tenth grade education requirement and nearly two years after the passage of the Civil Rights Act of 1964, the defendants' operative force was still approximately 84% white. In February of 1969, the picture had not changed to any substantial degree and 82% of the male operatives were white while 89.8% of the female operatives were white. In March, 1970, during the period in which the EEOC charges which are pertinent to this case were lodged against defendants and at a time when the charges were under inves-

---

**5.** Although not cited as frequently in this opinion, the *Georgia Power* opinion was actually of more benefit to the court in determining the merits in this case than was the *Griggs* opinion. First, the defendants in *Georgia Power* actually presented a business necessity defense, something which was merely contemplated by the Court in *Griggs*. Second, the *Georgia Power* opinion dealt specifically with a minimum education requirement, 474 F.2d at 918–19, whereas *Griggs* dealt principally with a requirement of a minimum score on an ability test.

**6.** "The administrative interpretation of [Title VII] by the [EEOC] is entitled to great deference." *Griggs, supra*, 401 U.S. at 433–34, 91 S.Ct. at 854, 28 L.Ed.2d at 165.

tigation by the EEOC, the company's records show that 76.6% of the male operatives were white and 82.8% of the female operatives were white.

The racial makeup of Travenol's operative force changed significantly between 1970 and 1973. By March of 1973, 54.1% of the male operatives were white and 70.1% of the female operatives were white. The court cannot ignore the implication that the real incentive for the meaningful progress in integration of the operative work force which the defendants achieved between 1970 and 1973 was furnished by the plaintiffs' charges with the EEOC and the subsequent institution of this lawsuit.

By February of 1974, 37.4% of the defendants' male operatives were white as were 57.5% of the female operatives. The 1970 Census Report indicates that in Bolivar County white comprised 52.2% of the male population 18 years of age and older and 46.2% of the female.

While the above figures disclose a commendable degree of progress by the defendants, especially in the very recent past, in bringing blacks into the operative work force in numbers approaching the racial composition of the community, they also disclose significant underrepresentation of blacks in the operative work force during the early years in dispute in this case, 1970 and 1971.

## TWELFTH GRADE REQUIREMENT

The defendants presently require a twelfth grade education for all office and clerical jobs, which include mail room duplicating clerk, telephone operator/receptionist, secretary, inventory clerk, accounting clerk, steno-clerk, and keypunch and data processing operator. The twelfth grade education requirement also applies to all technician jobs in the plant, including maintenance scheduler, molding technician, release coordinator, release coordinator (solutions), pharmaceutical chemical laboratory technician, chemical plant laboratory technician, standard technician in the industrial engineering department and molding specialist. Also subject to the twelfth grade require-

ment are apprentice mechanic jobs of all kinds, although the requirement does not apply to persons who have completed a course of training in a vocational-technical school, or to persons with military experience in mechanical fields. All supervisory jobs, from group leader up, require a high school diploma, including the operative supervisors.

The defendants have not validated, in accordance with the EEOC or the Office of Federal Contract Compliance (OFCC) guidelines, the twelfth grade education requirement now in effect at their Cleveland plant.

Although there is a substantial turnover among office and clerical employees, these jobs have, since the opening of the plant, been held exclusively or disproportionately by whites. The precise date of the adoption of the twelfth grade requirement is unclear; however, it was adopted sometime subsequent to passage of the Civil Rights Act of 1964. Incumbent employees are not required to satisfy the education requirement as a condition of continued employment. It goes without saying that the beneficiaries of that policy were and are overwhelmingly white.

The court must, of course, approach the issue of whether defendants' high school diploma requirement contravenes Title VII in the same manner as the legality of the tenth grade requirement was approached.

The question of whether the diploma requirement operates to disqualify blacks in substantially greater numbers than whites is, as was the same inquiry regarding the tenth grade standard, easily resolved. In Bolivar County in 1970, this requirement disqualified 91.9% of black males over 25 and 88.9% of the black females over 25, but only 47.2% of white males and 41.9% of white females of this age. As with the tenth grade requirement, there is no evidence that such a large number of black persons possess twelfth grade equivalencies or GED diplomas, relative to whites possessing such credentials, so as to eliminate or reduce the disproportionately adverse impact of this requirement on blacks.

■ In response to an interrogatory propounded to them by plaintiffs, defendants outlined the duties of the office and clerical workers of whom a high school diploma is required. These positions include telephone operator/receptionist, key punch and data processing operator, secretary, and mail room and duplicating clerk. Upon close examination of these duties, it does not appear to the court that there is a tangible relationship between the duties of the great majority of defendants' office and clerical staff and any particular level of education. This is especially so regarding the duties of the telephone operator/receptionist and the mail room and duplicating clerk. Lack of a diploma would not conclusively demonstrate that an applicant failed to possess the qualifications necessary to efficiently fulfill the duties of office and clerical workers in defendants' employ, just as possession of a twelfth grade education would not of itself demonstrate that an applicant is qualified for one of these jobs.

Since the institution of the high school diploma standard, the defendants have not considered the use of any alternative to that particular requirement as a screening device. In view of the grossly disparate effect of the requirement on the black members of the labor pool in the Cleveland, Mississippi area the court cannot condone its continued use absent some efforts by defendants to discover and employ some other effective standard with a more racially neutral impact.[7]

Defendants also require a high school diploma of those employees who will be considered for promotion to supervisory positions and of those applicants for employment in technician jobs at defendants' plant. Regarding the technician job, defendants maintain that the education requirement is essential to ensure the persons hired for those positions possess the qualities necessary to successfully discharge the duties of the job. The qualities which defendants claim they seek in persons to be employed as technicians are alertness, judgment, comprehension, adaptability, responsibility and initiative. Defendants further argue that their supervisors must possess the same attributes as technicians plus a certain degree of leadership ability in order to effectively perform their duties.

Although there is no doubt that possession of the aforementioned attributes which defendants desire in the persons whom they employ as supervisors and technicians are important, if not absolutely necessary, qualifications, the court perceives no direct relationship between the possession of a high school diploma and the possession of any or all of these qualities. As with the tenth grade requirement, the defendants are simply employing too crude a standard in view of the all but undisputed adverse effect upon blacks.

## COLLEGE DEGREE REQUIREMENT

Defendants presently require an applicant for the job of scheduling analyst, traffic analyst, or systems analyst possess a college degree; however, the degree need not be in any particular discipline or major.

■ Again, the 1970 Census Report for Mississippi demonstrates that this requirement has a substantial adverse impact on blacks. In Bolivar County in 1970, for example, 14.7% of the white males over 25 and 12.5% of the white females over 25 have college degrees, whereas only 3.2% of black males and 3.3% of black females of the same age have degrees. In Mississippi as a whole, 10% of the white persons in the state

---

7. Although it appears that the education requirement was not completely to blame, defendants' office and clerical work force was overwhelmingly white as late as six months prior to trial. Between April 1, 1971 and August, 1974, seventy-eight whites and forty-one blacks applied for office or clerical jobs at the Cleveland plant. Ten of the one hundred nineteen applicants were ultimately hired. All ten were white. Between the opening of the defendants' plant in 1950 and August of 1974, no black was hired for an office or clerical job. Defendants have, since 1966, integrated their office and clerical work force to some extent— less than ten percent is black—by transferring black persons employed in other capacities into office and clerical jobs. Defendants have hired some black applicants with clerical qualifications, but have assigned them to work as operatives on the production line.

over 25 met this requirement while only 3.7% of the black people did.

The college degree requirements for traffic and systems analysts were not instituted until some time subsequently to July 15, 1968. The requirement has not been validated pursuant to EEOC guidelines.

Although no one is presently employed in the traffic and systems analyst jobs, defendants concede that no black has ever been employed in an analyst capacity at their Cleveland plant.

■ The defendants argue that the college degree requirement for the jobs in the analyst category is necessitated by the "professional demands" of the positions. In view of the disparate effect of the requirement and in the absence of more concrete evidence as to the need for the continued use of this qualification, the court has concluded that the college degree requirement for the jobs of scheduling, systems, and traffic analysts is unjustified and unlawful.

## FAILURE TO POST OR ANNOUNCE VACANCIES IN JOBS ABOVE THE MATERIAL HANDLER AND ASSEMBLER LEVEL

■ Although the defendants ordinarily announce to assemblers and material handlers the existence of a vacancy in other assembler or material handler positions so that employees may make known their interest in these positions, it is not customary to announce or post information concerning vacancies in office or clerical jobs, technician jobs, or supervisory positions. Failure to post information concerning vacancies in the clerical, technician, and supervisory positions has resulted in the incumbents of those positions becoming the primary source of information concerning existing and/or expected vacancies. Since the supervisory, clerical, and technician work force, as well as the management, at Travenol's Mississippi facility has been and remains overwhelmingly white, the exposure to job vacancy information is much greater among white employees than among black. Travenol's failure to post notice of vacancies impedes the access of the company's black employees to the better paying and more desirable jobs.

## DISCRIMINATION IN PROMOTION

■ The most important criteria for promotion to jobs above the level of operative are an employee's length of service, possession of the requisite amount of education, and the opinion of the employee held by his or her supervisor and certain officials of the personnel department. Because of past and present hiring discrimination against blacks, reliance on length of service in making promotions has a disproportionately adverse impact upon blacks' prospects of promotion. The racial make-up of the defendants' noncustodial work force, exclusive of the operatives, is reflected in the following statistics:

| Job Level | May, 1964 No. | May, 1964 %White | March, 1966 No. | March, 1966 %White | March, 1968 No. | March, 1968 %White |
|---|---|---|---|---|---|---|
| Officials and Managers | 13 | 100% | 24 | 100% | 49 | 100% |
| Professionals | 0 | --- | 18 | 100% | 20 | 100% |
| Technicians | 25 | 100% | 27 | 100% | 66 | 97.0% |
| Office and Clerical | 24 | 100% | 23 | 95.7% | 33 | 97.0% |
| Craftsmen | 46 | 100% | 18 | 100% | 32 | 100% |

| Job Level | Feb., 1969 No. | Feb., 1969 %White | March, 1970 No. | March, 1970 %White | March, 1971 No. | March, 1971 %White |
|---|---|---|---|---|---|---|
| Officials and Managers | 52 | 100% | 52 | 100% | 48 | 100% |
| Professionals | 31 | 96.8% | 40 | 97.5% | 47 | 97.9% |
| Technicians | 51 | 98.0% | 14 | 100% | 12 | 100% |
| Office and Clerical | 29 | 96.6% | 33 | 97.0% | 35 | 94.3% |
| Craftsmen | 34 | 100% | 68 | 98.5% | 78 | 94.9% |

| Job Level | March, 1972 No. | March, 1972 %White | March, 1973 No. | March, 1973 %White | Feb., 1974 No. | Feb., 1974 %White |
|---|---|---|---|---|---|---|
| Officials and Managers | 52 | 100% | 47 | 97.9% | 53 | 96.2% |
| Professionals | 52 | 94.2% | 40 | 92.5% | 43 | 88.4% |
| Technicans | 12 | 100% | 16 | 100% | 20 | 95.0% |
| Office and Clerical | 38 | 94.7% | 34 | 94.1% | 38 | 92.1% |
| Craftsmen | 79 | 93.7% | 76 | 93.4% | 94 | 86.2% |

All in all, the court has concluded that the procedures for promotion which defendants employ tend to perpetuate the past discrimination suffered by blacks at defendants' Cleveland plant. All the criteria used in the promotion process, while racially neutral on their face, suffer from this failing. Reliance upon length of service must have some adverse effect upon blacks because of their prior exclusion from defendants' non-custodial work force. Use of the twelfth grade requirement has a clearly adverse effect upon blacks in and around Cleveland, Mississippi as was seen earlier. And dependence upon the recommendation of defendants' predominantly white supervisory force is a "ready mechanism" to further impede black access to the supervisory ranks. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 240–43 (5th Cir. 1974); *Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir. 1972). The court is of the opinion that, at the minimum, defendants should be required to refrain from use of the twelfth-grade education requirement and to develop and utilize some objective criteria for selection of operatives to be promoted to supervisory positions which will be racially neutral both on their face and in effect. *Pettway, supra*, at 241.

The overall impression of the defendants' operation of their Cleveland plant which the court acquired at the trial in this case is one of well intentioned management attempting to deal with job applicants and employees, equally on a case by case, or individual basis; however, the employment policies which defendants adopted in apparent good faith have had the effect of substantially impeding the entry of blacks into the company's work force. The full extent of the cumulative effect of these policies is perhaps not yet appreciated by Travenol management, but the statistics brought forth in this case cannot fail to convince an objective observer that employment opportunities at Travenol's Cleveland plant were certainly, and to some extent remain, far from equal at the times pertinent to this case.

While it is no doubt true that a great deal of the segregated nature of defendants' operation in Cleveland may be traced to the racial discrimination which has historically permeated American society in general, by passage and implementation of the Civil Rights Act of 1964, the Congress of the United States announced that the time has arrived to bring minorities into the work force of the nation's industries on an equal footing with persons of the majority race. As the Supreme Court has stated:

The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668, 676 (1973).

On the record in this case, the court is constrained to hold that Travenol's employment practices, particularly prior to 1973, were not consistent with the requirements of Title VII and its underlying purposes and goals. Accordingly, it will be necessary for defendants to make some adjustments in their employment practices in order to comply with the law of the land.

### SEX DISCRIMINATION

From February of 1965 until 1968, the master job order form used by the Cleveland office of the state employment services

(MSES), specified "male" as a requirement for the material handler positions at the Travenol plant and "female" for the assembler positions. At some point during the summer of 1968, Travenol's personnel manager visited the Cleveland office of MSES and requested elimination of the sex designations on the referral forms. However, sex identification of the assembler position was such in the minds of prospective job applicants that no male applied for an assembler position at defendants' plant until March 31, 1971. Likewise, no females applied for the material handler positions until November of 1971. Defendants did, however, in December 1970, provide female assemblers an opportunity to transfer to material handler positions. Two female assemblers accepted the invitation to transfer. Later, in 1971, a number of female assemblers became material handlers, but ultimately all chose to return to the assembler position.

By the fall of 1972, women made up 100 percent of the assembler work force, but only 2.6 percent of the material handler work force. As was mentioned earlier, assemblers are compensated at a substantially lower rate of pay than material handlers.[8]

One of the most arduous and physically demanding positions at defendants' plant is known as the "hooks" job. The hooks positions are occupied by material handlers whose chief job duty is to place empty bottles on and remove filed bottles from the production line. The hooks positions are found only in the solution filling and solution packing departments of the plant. Of the approximately two hundred material handlers employed at defendants' Cleveland plant, about half are assigned to the filling and packing departments. Approximately half the material handlers in these depart-

ments—forty to fifty individuals—are assigned to the hooks jobs.

Although there was no policy concerning assignments to the hooks positions prior to 1966, at some point subsequent to that time a practice was established whereby those material handlers performing the hooks job would have the first option—the right of first refusal—at any vacancies which might develop in the other material handler positions within the filling and packing departments. As might be imagined, this policy became necessary because the physical exertion inherent in the hooks positions caused them to be regarded among the employees as somewhat less desirable than the other material handler jobs.

When a vacancy develops in a material handler's job, defendants ordinarily announce its existence to all persons then working as assemblers or material handlers. Each material handler interested in a lateral transfer and each assembler interested in upgrading to a material handlers job may request a transfer and/or promotion. However, material handlers in the hooks positions are given first refusal on the vacancy. Hooks workers very rarely decline offers to transfer to non-hooks positions. This right of first refusal has the effect of transforming any material handler vacancy into a vacancy on the hooks jobs.

Placing the matter in context and considering all the evidence offered at trial the court, as fact finder, has concluded that the defendants, intentionally or otherwise, have structured the material handler jobs at their Cleveland plant so that while the vast majority of them require little heavy lifting, there are a few positions—particularly the hooks jobs—which required a great deal of heavy lifting. The prospect of facing the requirements of the duties of a hooks work-

8. Historically, the assembler pay rate has been closely related to that of the custodial or janitorial staff. In 1965, assemblers were paid four cents per hour more than custodians while material handlers were paid twenty-seven cents per hour more than assemblers. Since 1965, the assembler pay rate has remained tied to that of the custodial work force while the gap between the material handler and assembler

pay rates has widened considerably. In 1974, assemblers were paid only three cents per hour more than custodians but material handlers were paid forty-six cents per hour more than assemblers.

As of July 5, 1974, the starting pay rate for material handlers was $3.11 per hour, for assemblers $2.65, and for custodial employees $2.62 per hour.

er has been an almost foolproof method of blocking the entry of females into the material handler work force. Of the thirteen females initially assigned as material handlers who quit their jobs because of physical inability to perform, eleven—or 84.5%—were assigned to the hooks positions. Among the forty-four females assemblers who declined promotion to material handler between August, 1971 and April, 1973, thirty-nine—or 88.6%—turned down the promotions because they would have found themselves assigned to the hooks positions in the solution filling or solution packing departments.

■ Although Travenol's management was and is aware that the spectre of the hooks position is effectively preventing entry of women into defendants' material handler work force, there has been no attempt to devise alternative methods of staffing the hooks positions. Because of the devastating impact of the hooks requirement on the movement of females into the material handler work force, Travenol must make at least some attempt to accommodate its employment practices with the goals and requirements of Title VII. EEOC Decision No. 71–1868, April 22, 1971, ¶ 6266, CCH EEOC Decisions (1973); EEOC Decision No. 72–0561, December 20, 1971, ¶ 6308, CCH EEOC Decisions (1973).

## SEX DISCRIMINATION RELATIVE TO PREGNANCY

Until 1972, defendants required pregnant employees to take a mandatory six month maternity leave without pay. The leave was required to begin three months prior to the expected date of delivery and to continue until three months after delivery. In May 1972, Travenol instituted a new policy allowing a pregnant employee to continue work prior to delivery so long as her doctor considered it advisable. The policy currently in effect also allows a new mother to return to work following delivery whenever the attending physician advises that a re-

sumption of employment would present no health problems. Under the present policy, maternity leave is still without pay.[9]

In contrast to their forced leave policy regarding pregnancy, the defendants have never required employees suffering from any other sort of medical problem or disability to take leave, particularly leave without pay, for a predetermined period of time.

Travenol maintains a salary continuation plan for the employees at its Cleveland plant which provides for payments at varying rates for certain categories for employees in the event of a disability precluding gainful employment. Although the plan provides for wage continuation during period of temporary disability due to other non-occupational causes, it does not provide payments for temporary pregnancy-related disabilities or for inability to work due to the pregnancy itself. However, the plan does provide for payments for disabilities caused by male gender-linked conditions, such as circumcision and hemophilia, and some disabilities more common among males, such as gout and prostatectomy.

Defendants argue that including payment for temporary pregnancy-related disabilities within the coverage of the salary continuation plan would substantially increase the costs of the plan and result in fewer benefits for all employees. The EEOC regulations on this point, which are entitled to "great deference", appear to counter defendants' argument neatly.

> It shall not be a defense under title VII to a charge of sex discrimination in [fringe] benefits that the cost of such benefits is greater with respect to one sex than the other. 29 C.F.R. § 1604.9.

Although there has as yet been no ruling by the Supreme Court on the question of whether the exclusion of pregnancy-related disabilities from fringe benefit programs—such as an income protection plan—maintained by an employer transgresses the

---

9. The company policy in this regard is set forth in the following language:

"Maternity leaves of absence will be unpaid until such time as it is definitely determined that applicable law requires otherwise."

terms of Title VII, the Court addressed a related, albeit distinguishable, issue in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). In *Aiello*, the court held that the State of California did not violate the Equal Protection Clause of the Fourteenth Amendment by failing to include disabilities relating to normal pregnancy under the coverage of its statewide and completely employee funded disability insurance program.

■ Although defendants argue that *Aiello* is dispositive of the pregnancy disability issues here, the court is more inclined to agree with the analysis of *Aiello* contained in *Wetzel v. Liberty Mut. Ins. Co.*, 511 F.2d 199 (3rd Cir. 1975), cert. granted, 421 U.S. 987, 95 S.Ct. 1989, 44 L.Ed.2d 476,[10] if for no other reason but that in *Aiello* the standard against which defendants' conduct was measured was a constitutional one whereas here it is statutory (Title VII). Two other appellate courts have similarly interpreted *Aiello*. *Communications Workers v. American Tel. and Tel. Co.*, 513 F.2d 1024, 1030–31 (2nd Cir. 1975); *Gilbert v. General Elec. Co.*, 519 F.2d 661, 665–67 (4th Cir. 1975). Accordingly, the court is of the opinion that, in order to comply with Title VII, Travenol must extend full and equal coverage of all its fringe benefit programs to women. Particularly, the disability leave and salary continuation programs must be altered so as to discontinue disparate treatment of pregnant employees, pregnancy, and pregnancy-related disabilities.

## SENIORITY RIGHTS

Having found defendants' hiring and promotion policies violative of Title VII as to both blacks and females, the court must finally address the legality of the procedure employed at the Cleveland plant to determine which employees will be affected in the event of a lay-off or other reduction in the work force.

So far as the evidence shows, Travenol's Cleveland plant never experienced a lay-off until 1972. As a matter of fact, prior to 1972 the defendants had not even formulated a plan or procedure for use in the event of a lay-off. Not surprisingly, the lay-off policy adopted in 1972 was the customary "last hired/first fired" standard.

The 1972 lay-off at the Cleveland plant had a disproportionately adverse effect upon black females. At the time of the lay-off, there were 1068 persons employed as operatives at Travenol's Cleveland plant. A total of 225 persons were laid-off in the course of the reduction in work force. Of the 306 males employed as operatives at the time, 56, or only 15% of the male work force, were detrimentally affected by the lay-off. Of the 566 white female operatives employed at the time, 87, or only 15.4% of the white female operative work force, were laid-off in the course of the reduction in employees. But of the 196 black females employed as operatives at the time of the lay-off, 41.8%, or 82 black women, were adversely affected.

It appears that the law concerning lay-offs which disproportionately affect females and minorities is in an even more unsettled state than that concerning pregnancy disabilities, if such is possible. Of course, the court has not been left completely adrift for, as the Fifth Circuit has said, in an employment discrimination case, it is the duty of the district court in the exercise of its discretion, "to carry out within practicable limits the purpose of Title VII, which is to make the discriminatee whole and to remedy the effects of past discrimination." *Franks v. Bowman Trans. Co.*, 495 F.2d 398, 414 (5th Cir. 1974), cert. granted, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975). In the context of considering the legality of a seniority system of an employer which has been found, at some point in the past, to have engaged in unlawful employment practices, the difficulty arises in determining whether the employ-

10. Although the Supreme Court's ultimate disposition of *Wetzel* would be of great benefit in determining the issues in this case relating to pregnancy, the court does not feel justified in delaying decision on the point pending the outcome of *Wetzel*.

ees now seeking relief from operation of the seniority plan are, in fact, discriminatees under Title VII.

In this circuit, this issue was most recently addressed in *Watkins v. United Steel Workers*, 516 F.2d 41 (5th Cir. 1975). In *Watkins*, the court refused to disturb the operation of a last hired/first fired lay-off plan, meticulously couching its holding in the following language:

> We hold that, regardless of an earlier history of employment discrimination, when present hiring practices are nondiscriminatory and have been for over ten years, an employer's use of a long-established seniority system for determining who will be laid-off, and who will be rehired, adopted without intent to discriminate, is not a violation of Title VII or § 1981 [of Title 42 of the U.S.Code], even though the use of the seniority system results in the discharge of more blacks than whites to the point of eliminating blacks for the work force, where the individual employees who suffer lay-off under the system have not themselves been the subject of prior employment discrimination. 516 F.2d at 44–45.

█ The holding in *Watkins* is inapplicable to the instant case for many reasons; however, it does point out the various factors which must be considered when determining whether a seniority system somehow fails to comply with Title VII. In the case at bar, the court has found that the employer has a recent history of employment discrimination in the hiring process as to both race (education requirements) and sex (exclusion of females from the material handler work force). In fact, the court has determined that the employer here is presently engaging in some unlawful employment practices as to both females and blacks. Here, in contrast to *Watkins*, the seniority system employed in the event of layoff is of recent origins, having been initially instituted in 1972. Further, it is clear that some of the employees who would be and were affected in the event of a lay-off

have themselves been the victims of prior discrimination in hiring practices. For example, it appears likely that, absent the tenth-grade education requirement which the court has found unlawful under Title VII, Ms. Cherry's plant-wide seniority would date from 1970, and that of Ms. Griffin from 1966.

█ Pending the decision of the Supreme Court in *Franks, supra*, it is apparently the law in this circuit that only those black and/or female employees who have been prevented from attaining their "rightful place" of employment *as individuals* by their employer's unlawful practices are entitled to any relief from a last hired/first fired lay-off system.[11] In other words, only those members of the plaintiff class in this case who can show that, but for Travenol's unlawful discrimination, they would have acquired such seniority rights as to afford them to some degree of insulation from the adverse effects of a lay-off are entitled to any relief from the across-the-board operation of the seniority system. Because such a determination may require a case-by-case examination as to the factual situation of each member of the class, it is impossible for the court to frame any sort of relief at this juncture, having thus far inquired into the merits of the case as to the existence of unlawful discriminatory practices only. However, it is clear at this point that some modification of the last hired/first fired lay-off policy will be required in order to afford the black victims of the tenth and twelfth grade requirements and the female victims of the job assignment discrimination their rightful places within the structure of the seniority system.

## CONCLUSION

By way of summary, the court has determined that, for the reasons set forth in this opinion, an injunction should be issued prohibiting defendants from requiring a tenth grade education (or GED equivalency) of applicants for operative positions; barring

11. Apparently such is also the law in the Second Circuit. See *Chance v. Board of Examiners*, 534 F.2d 993 (2nd Cir. 1976), 44 U.S.L.W. 2343 (Jan. 19, 1976).

defendants from requiring a twelfth grade education (or GED equivalency) of applicants for office and clerical jobs, technician jobs, and supervisory positions; and enjoining Travenol from requiring a college degree as a qualification for the jobs of systems, traffic, or scheduling analyst. The court will also enter an order directing defendants to include pregnancy and pregnancy-related disabilities under the coverage provided in the salary continuation plan currently in effect on the same basis as all other disabilities. However, either because the record has not yet been sufficiently developed or because the court does not intend to undertake to assume the management of defendants' plant on a day-to-day basis, the court is not presently in a position to rule on the backpay question, the specific alterations to the defendants' seniority system which are necessary to afford certain employees their "rightful places", or the question of modification of the manner in which employees are assigned to the hooks positions in the solution packing and filling departments. On these issues, the court has determined to require the parties to submit suggestions and proposals as to how the court should approach disposition of these questions. An order will be entered accordingly.