Justice Ginsburg,
with whom Justice Breyer joins, and with whom Justice Sotomayor and Justice Kagan join as to all but footnote 1, dissenting.
Section 1 of the Fourteenth Amendment provides: “No State shall... deny to any person within its jurisdiction the equal protection of the laws.” Section 5 grants Congress the “power to enforce, by appropriate legislation, the provisions of this article.” Congress’ §5 enforcement power includes the authority to remedy and deter violations of § l’s substantive guarantees by prohibiting conduct “not itself forbidden by the Amendment’s text.” Kimel v. Florida Bd. of Regents, 528 U. S. 62, 81 (2000). “In other words, Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct.” Nevada Dept. of Human Resources v. Hibbs, 538 U. S. 721, 727-728 (2003).
The Family and Medical Leave Act of 1993 (FMLA or Act) entitles eligible employees to 12 weeks of job-secured leave during any 12-month period: (A) to care for a newborn son *46 or daughter; (B) to care for a newly adopted son or daughter; (C) to care for a spouse, child, or parent with a serious health condition; or (D) because the employee has a serious health condition that makes her unable to perform the functions of her position. 29 U. S. C. § 2612(a)(1).
Even accepting this Court’s view of the scope of Congress’ power under §5 of the Fourteenth Amendment, I would hold that the self-care provision, § 2612(a)(1)(D), validly enforces the right to be free from gender discrimination in the workplace.[1]
I
Section 5 legislation “must be targeted at conduct transgressing the Fourteenth Amendment’s substantive provisions,” ante, at 36 (internal quotation marks omitted), “[a]nd ‘[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.’ ” Ibid, (quoting City of Boerne v. Flores, 521 U. S. 507, 520 (1997)). The first step of the now-familiar Boerne inquiry calls for identification of the constitutional right Congress sought to enforce. See, e. g., Tennessee v. Lane, 541 U. S. 509, 522 (2004). The FMLA’s self-care provision, Maryland asserts, trains not on the right to be free from gender discrimination, but on an “equal protection right to be free from irrational state employment discrimination based on a medical condition.” Brief for Respondents 14. The plurality agrees, concluding that the self- *47 care provision reveals “a concern for discrimination on the basis of illness, not sex.” Ante, at 38. In so declaring, the plurality undervalues the language, purpose, and history of the FMLA, and the self-care provision’s important role in the statutory scheme. As well, the plurality underplays the main theme of our decision in Hibbs: “The FMLA aims to protect the right to be free from gender-based discrimination in the workplace.” 538 U. S., at 728.
I begin with the text of the statute, which repeatedly emphasizes gender discrimination. One of the FMLA’s stated purposes is to “entitle employees to take reasonable leave,” 29 U. S. C. § 2601(b)(2), “in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis,” § 2601(b)(4). Another identified aim is “to promote the goal of equal employment opportunity for women and men, pursuant to [the Equal Protection Clause].” § 2601(b)(5). “[E]mployment standards that apply to one gender only,” Congress expressly found, “have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.” § 2601(a)(6).
The FMLA’s purpose and legislative history reinforce the conclusion that the FMLA, in its entirety, is directed at sex discrimination. Indeed, the FMLA was originally envisioned as a way to guarantee — without singling out women or pregnancy — that pregnant women would not lose their jobs when they gave birth. The self-care provision achieves that aim.
A brief history is in order. In his 1982 congressional campaign, then-candidate Howard Berman pledged to introduce legislation similar to the California law challenged in California Fed. Sav. & Loan Assn. v. Guerra, 479 U. S. 272 *48 (1987). S. Wisensale, Family Leave Policy: The Political Economy of Work and Family in America 134 (2001) (hereinafter Wisensale). California’s law, enacted in 1978, made it unlawful for an employer to refuse to grant female employees disabled by pregnancy or childbirth up to four months’ unpaid, job-protected leave. See 1978 Cal. Stats, ch. 1321, § 1, now codified at Cal. Govt. Code Ann. § 12945(a)(1) (West Supp. 2012).
The California law sharply divided women’s rights advocates. “Equal-treatment” feminists asserted it violated the Pregnancy Discrimination Act’s (PDA) commitment to treating pregnancy the same as other disabilities.[2] It did so by requiring leave only for disability caused by pregnancy and childbirth, thereby treating pregnancy as sui generis. See Brief for American Civil Liberties Union et al. as Amici Curiae in California Fed., O. T. 1985, No. 85-494, pp. 5-10. “Equal-opportunity” feminists disagreed, urging that the California law was consistent with the PDA because it remedied the discriminatory burden that inadequate leave policies placed on a woman’s right to procreate. See Brief for Coalition for Reproductive Equality in the Workplace et al. as Amici Curiae in id., at 2-6. See also Williams, Equality’s Riddle: Pregnancy and the Equal Treatment/ Special Treatment Debate, 13 N. Y. U. Rev. L. & Soc. Change 325, 326-328 (1984-1985) (hereinafter Williams) (discussing disagreement).
While California Fed. moved through the lower federal courts, equal-treatment feminists began work on a gender- *49 neutral leave model, which eventually became the FMLA. See Ross, Legal Aspects of Parental Leave, in Parental Leave and Child Care 97 (J. Hyde & M. Essex eds. 1991) (hereinafter Ross). Then-Congressman Berman met with the Women’s Legal Defense Fund’s Donna Lenhoff, a drafter of the first FMLA bill. Id., at 114-115, n. 27; Wisensale 136.[3] They agreed that any national bill would focus not only on pregnancy, but on equal treatment for all workers. Ross 114-115, n. 27. See also Kazmier v. Widmann, 225 F. 3d 519, 547 (CA5 2000) (Dennis, J., dissenting) (“Perceiving that enacting the PDA had not achieved the intended result of preventing discrimination against either women or men in the granting of leave time in that the States felt it necessary to affirmatively grant pregnancy leave to women and not men, in 1985 Congress began considering the issue of family and medical leave.”).
Though this Court, in California Fed., eventually upheld California’s pregnancy-only leave policy as not preempted by the PDA, equal-treatment feminists continued to believe that viewing pregnancy as sui generis perpetuated widespread discrimination against women.[4] They therefore maintained *50 their commitment to gender-neutral leave. See Joint Hearing on H. R. 925 before the Subcommittee on Civil Service and the Subcommittee on Compensation and Employee Benefits of the House Committee on Post Office and Civil Service, 100th Cong., 1st Sess., 36 (1987) (hereinafter 1987 House Hearing) (statement of Prof. Eleanor Holmes Norton, Georgetown University Law Center) (“[If California Fed.] becomes the model, employers will provide something for women affected by pregnancy that they are not required to provide for other employees. This gives fodder to those who seek to discriminate against women in employment.... In the [California Fed.] case, I would have preferred the interpretation urged by the [equal-treatment feminists].”).
Congress agreed. See infra, at 58-59. Adhering to equal-treatment feminists’ aim, the self-care provision, 29 U. S. C. § 2612(a)(1)(D), prescribes comprehensive leave for women disabled during pregnancy or while recuperating from childbirth — without singling out pregnancy or childbirth. See S. Rep. No. 101-77, p. 32 (1989) (A “significant benefit of the temporary medical leave provided by this legislation is the form of protection it offers women workers who bear children. Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy-related disability. Legislation solely protecting pregnant women gives *51 employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect.”)- In view of this history, it is impossible to conclude that “nothing in particular about self-care leave . . . connects it to gender discrimination.” Ante, at 42.
II
A
Boerne next asks “whether Congress had evidence of a pattern of constitutional violations on the part of the States.” Hibbs, 538 U. S., at 729. See also Boerne, 521 U. S., at 530-532. Beyond question, Congress had evidence of a well-documented pattern of workplace discrimination against pregnant women. Section 2612(a)(1)(D) can therefore “be understood as responsive to, or designed to prevent, unconstitutional behavior.” Id., at 532.
Although the PDA proscribed blatant discrimination on the basis of pregnancy, see 42 U. S. C. §§ 2000e(k), 2000e-2, supra, at 48, n. 2, the Act is fairly described as a necessary, but not a sufficient, measure. FMLA hearings conducted between 1986 and 1993 included illustrative testimony from women fired after becoming pregnant or giving birth. For example, Beverly Wilkenson was granted seven weeks of leave upon the birth of her child. On the eve of her return to work, a superior informed her that her job had been eliminated. He stated: “Beverly, the best thing for you to do is stay home and take care of your baby and collect your unemployment.” Hearing on H. R. 770 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 101st Cong., 1st Sess., 12 (1989) (hereinafter 1989 House Hearing) (statement of Beverly Wilkenson). See also S. Rep, No. 102-68, p. 27 (1991) (hereinafter 1991 Senate Report) (describing Ms. Wilken-son’s testimony). Similarly, Linda Pillsbury was notified that she no longer had a job three weeks after her daughter *52 was born.[5] Three secretaries at the same workplace were also forced out of their jobs when they returned to work within weeks of giving birth. See Hearings on S. 249 before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 100th Cong., 1st Sess., pt. 2, pp. 16,23 (1987) (hereinafter 1987 Senate Hearings) (statement of Linda Pillsbury).
These women’s experiences, Congress learned, were hardly isolated incidents. A spokeswoman for the Mayor’s Commission on Women’s Affairs in Chicago testified: “The lack of uniform parental and medical leave policies in the workplace has created an environment where discrimination is rampant. Very often we are contacted by women workers who are at risk of losing their jobs or have lost them because they are pregnant, [or have] given birth.” Id., at 170 (statement of Peggy Montes). See also Joint Hearing on The Parental and Medical Leave Act of 1986 before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., 110, n. 18 (1986) (hereinafter 1986 House Hearing) (statement of Women’s Legal Defense Fund) (“[W]omen who are temporarily unable to work due to pregnancy, child-birth, and related medical conditions such as morning sickness, threatened miscarriage, or complications arising from childbirth, often lose their jobs because of the inadequacy of their employers’ leave policies.”); 1991 Senate Report 28 (recording that an Atlanta-based job counseling hotline received approximately 100 calls eaeh year from women who were fired, harassed, or forced out of their jobs due to pregnancy or maternity-disability leave); 139 Cong. Rec. 1826 (1993) (remarks of Sen. Edward Kennedy) (“[W]omen who are pregnant are discriminated *53 against as a general rule in our society and have difficulty retaining their jobs.”)- As summarized by the American Bar Association:
“Historically, denial or curtailment of women’s employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women’s roles has in turn justified discrimination against women when they are mothers or mothers-to-be.” 1989 House Hearing 248 (American Bar Association Background Report). See also Hibbs, 538 U. S., at 736 (quoting same language).
“Many pregnant women have been fired when their employer refused to provide an adequate leave of absence,” Congress had ample cause to conclude. See H. R. Rep. No. 99-699, pt. 2, p. 22 (1986). Pregnancy, Congress also found, has a marked impact on women’s earnings. One year after childbirth, mothers’ earnings fell to $1.40 per hour less than those of women who had not given birth. See 1991 Senate Report 28. See also 1989 House Hearing 356-357 (Report of 9to5, National Association of Working Women (citing same study)).
Congress heard evidence tying this pattern of discrimination to the States. A 50-state survey by the Yale Bush Center Infant Care Leave Project concluded that “[t]he proportion and construction of leave policies available to public sector employees differs little from those offered private sector employees.” Hibbs, 538 U. S., at 730, n. 3 (quoting 1986 House Hearing 33 (statement of Meryl Frank)). Roughly 28% of women employed in the public sector did not receive eight weeks of job-protected medical leave to recover from childbirth. See 1987 Senate Hearings, pt. 1, pp. 31, 35, 39 (statement of James T. Bond, National Council of Jewish Women). A South Carolina state legislator testified: “[I]n *54 South Carolina, as well as in other states ... no unemployment compensation is paid to a woman who is necessarily absent from her place of employment because of pregnancy or maternity.” See id., pt. 2, p. 361 (statement of Rep. Irene Rudnick). According to an employee of the State of Georgia, if state employees took leave, it was held against them when they were considered for promotions: “It is common practice for my Department to compare the balance sheets of workers who have and have not used [leave] benefits in determining who should and should not be promoted.” Hearing on H. R. 2 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 102d Cong., 1st Sess., 36 (1991) (statement of Robert E. Dawkins). See also id., at 33 (One type of leave for Georgia state employees “boils down to whether your supervisor wants you to come back or not.”). In short, Congress had every reason to believe that a pattern of workplace discrimination against pregnant women existed in public-sector employment, just as it did in the private sector.
B
“[A] state’s refusal to provide pregnancy leave to its employees,” Maryland responds, is “not unconstitutional.” Brief for Respondents 23 (citing Geduldig v. Aiello, 417 U. S. 484, 495 (1974)). Aiello’s footnote 20 proclaimed that discrimination on the basis of pregnancy is not discrimination on the basis of sex. In my view, this case is a fit occasion to revisit that conclusion. Footnote 20 reads:
“The dissenting opinion , to the contrary, this case is ... a far cry from cases like Reed v. Reed, 404 U. S. 71 (1971), and Frontiero v. Richardson, 411 U. S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition— pregnancy — from the list of compensable disabilities. *55 While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification ....
“The lack of identity between the excluded disability and gender as such , under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups— pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.” 417 U. S., at 496-497, n. 20.
First, “[a]s an abstract statement,” it is “simply false” that “a classification based on pregnancy is gender neutral.” Bray v. Alexandria Women’s Health Clinic, 506 U. S. 263, 327 (1993) (Stevens, J., dissenting). Rather, discriminating on the basis of pregnancy “[b]y definition . . . discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male.” General Elec. Co. v. Gilbert, 429 U. S. 125, 161-162 (1976) (Stevens, J., dissenting). See also Issacharoff & Rosenblum, Women and the Workplace: Accommodating the Demands of Pregnancy, 94 Colum. L. Rev. 2154, 2180 (1994) (“[I]t is precisely because pregnancy is a condition unique to women that the exclusion of pregnancy from disability coverage is a sex-based classification . .. .”).
This reality is well illustrated by the facts of Aiello. The California disability-insurance program at issue granted disability benefits for virtually any conceivable work disability, including those arising from cosmetic surgery, skiing accidents, and alcoholism. See Brief for Equal Employment Opportunity Commission as Amicus Curiae in Aiello, O. T. 1973, No. 73-640, p. 7. It also compensated men for disabilities caused by ailments and procedures that affected men alone: for example, vasectomies, circumcision, and prostatec-tomies. See Brief for American Civil Liberties Union et al. *56 as Amici Curiae in id., at 17-18. Only pregnancy was excluded from the definition of disability. See Cal. Un. Ins. Code Ann. § 2626 (West 1972); Aiello, 417 U. S., at 489. As Justice Brennan insightfully concluded in dissent, “a limitation is imposed upon the disabilities for which women workers may recover, while men receive full compensation for all disabilities suffered .... Such dissimilar treatment of men and women, on the basis of physical characteristics inextricably linked to one sex, inevitably constitutes sex discrimination.” Id., at 501.
Second, pregnancy provided a central justification for the historic discrimination against women this Court chronicled in Hibbs. See 538 U. S., at 729 (“[A] proper discharge of [a woman's] maternal functions — having in view not merely her own health, but the well-being of the race — justifies] legislation to protect her from the greed as well as the passion of man.” (quoting Muller v. Oregon, 208 U. S. 412, 422 (1908); 2d and 3d alterations in Hibbs)). See also Siegel, Employment Equality Under the Pregnancy Discrimination Act of 1978, 94 Yale L. J. 929, 942 (1985) (Pregnancy is “a biological difference central to the definition of gender roles, one traditionally believed to render women unfit for employment.”). Relatedly, discrimination against pregnant employees was often “based not on the pregnancy itself but on predictions concerning the future behavior of the pregnant woman when her child was born or on views about what her behavior should be.” Williams 355. See also S. Rep. Ño. 95-331, p. 3 (1977) (“[T]he assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyping resulting in unfavorable disparate treatment of women in the workplace.”).
In sum, childbearing is not only a biological function unique to women. It is also inextricably intertwined with employers’ “stereotypical views about women’s commitment to work and their value as employees.” Hibbs, 538 U. S., at 736. Because pregnancy discrimination is inevitably sex discrimination, and because discrimination against women is *57 tightly interwoven with society’s beliefs about pregnancy and motherhood, I would hold that Aiello was egregiously wrong to declare that discrimination on the basis of pregnancy is not discrimination on the basis of sex.
C.
Boerne’s third step requires “‘a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.’ ” Ante, at 36 (quoting 521 U. S., at 520). Section 2612(a)(1)(D), I would conclude, is an appropriate response to pervasive discriminatory treatment of pregnant women. In separating self-care leave for the physical disability following childbirth, § 2612(a)(1)(D), which affects only women, from family-care leave for parenting a newborn baby, § 2612(a)(1)(A), for which men and women are equally suited, Congress could attack gender discrimination and challenge stereotypes of women as lone childrearers. Cf. Hibbs, 538 U. S., at 731 (States’ extended “maternity” leaves, far exceeding a woman’s physical disability following childbirth, were attributable “to the pervasive sex-role stereotype that caring for family members is women’s work.”).
It would make scant sense to provide job-protected leave for a woman to care for a newborn, but not for her recovery from delivery, a miscarriage, or the birth of a stillborn baby. And allowing States to provide no pregnancy-disability leave at all, given that only women can become pregnant, would obviously “exclude far more women than men from the workplace.” Id., at 738.
The plurality’s statement that Congress lacked “widespread evidence of sex discrimination ... in the administration of sick leave,” ante, at 38, misses the point. So too does the plurality’s observation that state employees likely “could take leave for pregnancy-related illnesses” — presumably severe morning sickness, toxemia, etc. — under paid sick-leave plans, ante, at 39. Congress heard evidence that existing sick-leave plans were inadequate to ensure that women were *58 not fired when they needed to take time out to recover their strength and stamina after childbirth. The self-care provision responds to that evidence by requiring employers to allow leave for “ongoing pregnancy, miscarriages, . . . the need for prenatal care, childbirth, and recovery from childbirth.” S. Rep. No. 103-3, p. 29 (1993).
That § 2612(a)(1)(D) entitles all employees to up to 12 weeks of unpaid, job-protected leave for a serious health condition, rather than singling out pregnancy or childbirth, does not mean that the provision lacks the requisite congruence and proportionality to the identified constitutional violations. As earlier noted, supra, at 50-51, Congress made plain its rationale for the prescription’s broader compass: Congress sought to ward off the unconstitutional discrimination it believed would attend a pregnancy-only leave requirement. Under the caption “Equal protection and nondiscrimination,” Congress explained:
“The FMLA addresses the basic leave needs of all employees. . . . This is an important principle reflected in the bill.
“A law providing special protection to women ..., in addition to being inequitable, runs the risk of causing discriminatory treatment. Employers might be less inclined to hire women .... For example, legislation addressing the needs of pregnant women only might encourage discriminatory hiring practices against women of child bearing age. Legislation addressing the needs of all workers equally does not have this effect. By addressing the serious leave needs of all employees, the FMLA avoids providing employers the temptation to discriminate [against women].
[[Image here]]
“The legislation is [thus] based not only on the Commerce Clause, but also on the guarantees of equal protection . . . embodied in the Fourteenth Amendment.” *59 H. R. Rep. No. 102-135, pt. 1, pp. 27-28 (1991) (hereinafter 1991 House Report).
Congress’ concern was solidly grounded in workplace realities. After this Court upheld California’s pregnancy-only leave policy in California 'Fed., Don Butler, President of the Merchants and Manufacturers Association, one of the plaintiffs in that case, told National Public Radio reporter Nina Totenberg that, as a result of the decision, “many employers will be prone to discriminate against women in hiring and hire males instead.” 1987 House Hearing 36. Totenberg replied, “But that is illegal, too” — to which Butler responded, “Well, that is illegal, but try to prove it.” Ibid.
Finally, as in Hibbs, it is important to note the moderate cast of the FMLA, in particular, the considerable limitations Congress placed on §§2612(a)(1)(A)-(D)’s leave requirement. See 538 U. S., at 738-739. FMLA leave is unpaid. It is limited to employees who have worked at least one year for the employer and at least 1,250 hours during the past year. §§2611(2)(A), 2612(d)(1). High-ranking employees, including state elected officials and their staffs, are not within the Act’s compass. §§ 203(e)(2)(C), 2611(3). Employees must provide advance notice of foreseeable leaves. § 2612(e). Employers may require a doctor’s certification of a serious health condition. § 2613(a). And, if an employer violates the FMLA, the employees’recoverable damages are “strictly defined and measured by actual monetary losses.” Hibbs, 538 U.S., at 740 (citing §§ 2617(a)(1)(A)(i)-(iii)). The self-care provision, I would therefore hold, is congruent and proportional to the injury to be prevented.
III
But even if Aiello senselessly holds sway, and impedes the conclusion that § 2612(a)(1)(D) is an appropriate response to the States’ unconstitutional discrimination against pregnant *60 women,[6] I would nevertheless conclude that the FMLA is valid §5 legislation. For it is a meet response to “the States’ record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of [parental and family-care] leave benefits.” Hibbs, 538 U. S., at 735. See also id., at 729-731, and n. 5 (Congress adduced evidence “of a pattern of constitutional violations on the part of the States” in granting parental and family-care leave).
Requiring States to provide gender-neutral parental and family-care leave alone, Congress was warned, would promote precisely the type of workplace discrimination Congress sought to reduce. The “pervasive sex-role stereotype that caring for family members is women’s work,” id., at 731, Congress heard, led employers to regard required parental and family-care leave as a woman’s benefit. Carol Ball, *61 speaking on behalf of the U. S. Chamber of Commerce, testified that she did not think “there are going to be many men that take up . . . parental leave.” See Hearing on S. 345 before the Subcommittee on Children, Family, Drugs, and Alcoholism of the Senate Committee on Labor and Human Resources, 101st Cong., 1st Sess., 39 (1989). She frankly admitted that she herself would choose to hire a man over an equally qualified woman if parental leave was required by law. Id., at 30.
Others similarly testified that mandating gender-neutral parental leave would lead to discrimination against women. A representative of the National Federation of Independent Business stated: “Requiring employers to provide parental leave benefits creates clear pressures for subtle discrimination based on .. . sex. When choosing between two equally qualified candidates, an employer may be more likely to hire the candidate least likely to take the leave. It is the wage levels and jobs of women of childbearing years which are most at risk in such a situation.” Hearing on H. R. 1 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 103d Cong., 1st Sess., 95 (1993). See also 1989 House Hearing 169 (statement of Cynthia Simpler, American Society for Personnel Administration) (“Since working women will be viewed as the most likely candidates for parental leave, hidden discrimination will occur if this bill becomes law. Women of childbearing age will be viewed as risks, potentially disrupting operations through an untimely leave.”).
Conversely — unlike perceptions surrounding who takes parental and family-care leave — Congress was told that men and women take medical leave approximately equally. According to one study, male workers missed an average of 4.9 days of work per year due to illness or injury; female workers missed 5.1 days. See 1991 House Report, pt. 1, p. 28. “[T]he incidence of serious medical conditions that would be covered by medical leave under the bill,” Congress deter *62 mined, “is virtually the same for men and women. Employers will find that women and men will take medical leave with equal frequency.” Ibid. “[P]arental and medical leave,” Congress was thus alerted, “are inseparable”:
“In the words of the old song, ‘You can’t have one without the other.’
[[Image here]]
“Adoption of parental leave protections without medical leave would . . . encourage discrimination against women of child-bearing age, who constitute approximately 73 percent of all the women in the labor force.
“Employers would tend to hire men, who are much less likely to claim [the parental leave] benefit. . . .
“Parental leave without medical leave would be the modern version of protective labor laws.” 1986 House Hearing 33-34 (statement of Irene Natividad, National Women’s Political Caucus).
Congress therefore had good reason to conclude that the self-care provision — which men no doubt would use — would counter employers’ impressions that the FMLA would otherwise install female leave. Providing for self-care would thus reduce employers’ corresponding incentive to discriminate against women in hiring and promotion. In other words, “[t]he availability of self-care leave to men serves to blunt the force of stereotypes of women as primary caregivers by increasing the odds that men and women will invoke the FMLA’s leave provisions in near-equal numbers.” See Brief for National Partnership for Women & Families et al. as Amici Curiae 26. As Judge Lipez explained:
“If Congress had drawn a line at leave for caring for other family members, there is greater likelihood that the FMLA would have been perceived as further reason to avoid granting employment opportunities to women. Heretofore, women have provided most of the child and elder care, and legislation that focused on these duties *63 could have had a deleterious impact because of the prevalent notion that women take more advantage of such leave policies. The inclusion of personal medical leave in the scheme, unrelated to any need to care for another person, undermines the assumption that women are the only ones taking leave because men, presumably, are as likely as women to get sick.” Laro v. New Hampshire, 259 F. 3d 1, 21 (CA1 2001) (dissenting opinion).
Senator Barbara Boxer advanced a similar point. Responding to assertions that the FMLA would lead employers to discriminate against women, Senator Boxer stated: “[T]o say that women will not be hired by business is a specious argument.... Men also get sick. They get cancer. They get heart disease. They have ailments. And this bill applies to men and women.” 139 Cong. Rec. 1697 (1993). See also 1987 Senate Hearings, pt. 2, p. 536 (statement of Prof. Susan Deller Ross, Georgetown University Law Center) (“I just think it’s wrong that there will be a perception that this is something that only women will take and they are, therefore, more expensive. Both men and women have medical conditions . . . .”).
The plurality therefore gets it wrong in concluding that “[o]nly supposition and conjecture support the contention that the self-care provision is necessary to make the family-care provisions effective.” Ante, at 41. Self-care leave, I would hold, is a key part of Congress’ endeavor to make it feasible for women to work and have families. See 1991 Senate Report 25-26 (“This legislation is essential if the nation is to address the dramatic changes that have occurred in the American workforce in recent years. . . . The once-typical American family, where the father worked for pay and the mother stayed at home with the children, is vanishing. ... Today, more than one-half of all mothers with infants under one year of age work outside the home. That figure has doubled since 1970 .... By the year 2000, about three out of every four American children will have mothers in the *64 workforce.”). By reducing an employer’s perceived incentive to avoid hiring women, § 2612(a)(1)(D) lessens the risk that the FMLA as a whole would give rise to the very sex discrimination it was enacted to thwart. The plurality offers no legitimate ground to dilute the force of the Act.
<i
Two additional points. First, this Court reached a different conclusion than the one I reach here in Board of Trustees of Univ. of Ala. v. Garrett, 531 U. S. 356 (2001), and Kimel, 528 U. S. 62. In those cases, as we observed in Hibbs, we reviewed statutes targeting disability and age discrimination, respectively. Neither disability nor age is a suspect classification under this Court’s Equal Protection Clause jurisprudence; States may discriminate on the basis of disability or age as long as the classification is rationally related to a legitimate state interest. See Garrett, 531 U. S., at 366-367; Kimel, 528 U. S., at 83-84. Therefore, for the statutes to be responsive to or designed to prevent unconstitutional discrimination, Congress needed to rely on a pattern of irrational state discrimination on the basis of disability or age. See Garrett, 531 U. S., at 368; Kimel, 528 U. S., at 89. Here, however, Congress homed in on gender discrimination, which triggers heightened review. See United States v. Virginia, 518 U. S. 515, 531 (1996) (“Parties who seek to defend gender-based government action must demonstrate an exceedingly persuasive justification for that action.” (internal quotation marks omitted)). “[I]t was [therefore] easier for Congress to show a pattern of state constitutional violations.” Hibbs, 538 U. S., at 736.
Finally, the plurality’s opinion does not authorize state employers to violate the FMLA, although it does block injured employees from suing for monetary relief. The self-care provision remains valid Commerce Clause legislation, Maryland concedes, and consequently binds the States, as well as the private sector. Tr. of Oral Arg. 25; Brief for Respond *65 ents 32-33. An employee wrongly denied self-care leave, Maryland also acknowledges, may, pursuant to Ex parte Young, 209 U. S. 123 (1908), seek injunctive relief against the responsible state official. See Brief for Respondents 33. Moreover, the U. S. Department of Labor may bring an action against a State for violating the self-care provision and may recover monetary relief on an employee’s behalf. 29 U. S. C. §§ 2617(b)(2)—(3), (d).
V
The plurality pays scant attention to the overarching aim of the FMLA: to make it feasible for women to work while sustaining family life. Over the course of eight years, Congress considered the problem of workplace discrimination against women, and devised the FMLA to reduce sex-based inequalities in leave programs. Essential to its design, Congress assiduously avoided a legislative package that, overall, was or would be seen as geared to women only. Congress thereby reduced employers’ incentives to prefer men over women, advanced women’s economic opportunities, and laid the foundation for a more egalitarian relationship at home and at work. The self-care provision is a key part of that endeavor, and, in my view, a valid exercise of congressional power under §5 of the Fourteenth Amendment. I would therefore reverse the judgment of the U. S. Court of Appeals for the Fourth Circuit.

 I remain of the view that Congress can abrogate state sovereign immunity pursuant to its Article I Commerce Clause power. See Seminole Tribe of Fla. v. Florida, 517 U. S. 44, 100 (1996) (Souter, J., dissenting). Beyond debate, 29 U. S. C. § 2612(a)(1)(D) is valid Commerce Clause legislation. See infra, at 64-65. I also share the view that Congress can abrogate state immunity pursuant to § 5 of the Fourteenth Amendment where Congress could reasonably conclude that legislation “constitutes an appropriate way to enforce [a] basic equal protection requirement.” Board of Trustees of Univ. of Ala. v. Garrett, 531 U. S. 356, 377 (2001) (Breyer, J., dissenting) (internal quotation marks omitted).

 Enacted as an addition to the section defining terms used in Title VII of the Civil Rights Act of 1964, the Pregnancy Discrimination Act of 1978 (PDA) provides: “The terms ‘because of sex’ or ‘on the basis of sex’ include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work_” 92 Stat. 2076,42 U. S. C. § 2000e(k).

 Lenhoff advanced The Parental and Disability Act of 1985, introduced by Rep. Patricia Schroeder. See S. Wisensale, Family Leave Policy: The Political Economy of Work and Family in America 136-138 (2001). She was later named Vice Chair of the Commission on Leave, created by the FMLA to study family and medical leave policies. See 29 U. S. C. §§ 2631-2632; U. S. Commission on Family and Medical Leave, A Workable Balance: Report to Congress on Family and Medical Leave Policies 210 (Apr. 30, 1996).

 For example, in addition to mandating pregnancy leave, the California statute allowed employers to discriminate against pregnant workers. Employers could refuse to select a pregnant woman for a training program if she would not finish the program at least three months before giving birth. See 1978 Cal. Stats, ch. 1321, §1. The law limited pregnancy-disability leave to six weeks, § 1, and provided that women were to receive paid disability benefits for only three weeks after childbirth, § 2, even if a particular woman remained disabled beyond the three-week period, and even if a man received paid disability benefits throughout his disabil *50 ity. Finally, although it prohibited employers from refusing to promote a woman because of pregnancy, it did not forbid refusing to hire a woman on that basis. See §1. See also Brief for National Organization for Women et al. as Amici Curiae in California Fed. Sav. & Loan Assn. v. Guerra, O. T. 1985, No. 85-494, pp. 14-15. These provisions were all expressly made inapplicable to employers covered by Title VII, “[i]n the event Congress enacts legislation amending Title VII ... to prohibit sex discrimination on the basis of pregnancy,” namely, the PDA. See 1978 Cal. Stats, ch. 1321, § 4.

 The medical recovery period for a normal childbirth is four to eight weeks. See Nevada Dept, of Human Resources v. Hibbs, 538 U. S. 721, 731, n. 4 (2003).

 Notably, the plurality does not cite or discuss Geduldig v. Aiello, 417 U. S. 484 (1974), perhaps embarrassed by that opinion’s widely criticized conclusion that discrimination based on pregnancy does not involve “discrimination based upon gender as such,” id., at 496, n. 20. See supra, at 54-57; E. Chemerinsky, Constitutional Law 759 (3d ed. 2006) (“It is hard to imagine a clearer sex-based distinction” than the one at issue in Aiello)-, Kay, Equality and Difference: The Case of Pregnancy, 1 Berkeley Women’s L. J. 1, 31 (1985) (“[Aiello] results in unequal treatment of similarly situated women and men who have engaged respectively in reproductive conduct [and wish to continue working]. It should be overruled.”); Law, Rethinking Sex and the Constitution, 132 U. Pa. L. Rev. 955, 983-984 (1984) (“Criticizing [Aiello] has ... become a cottage industry. Over two dozen law review articles have condemned both the Court’s approach and the result.... Even the principal scholarly defense of [Aiello] admits that the Court was wrong in refusing to recognize that the classification was sex-based . . . .”); Karst, The Supreme Court 1976 Term Foreword: Equal Citizenship Under the Fourteenth Amendment, 91 Harv. L. Rev. 1, 54, n. 304 (1977) (“[T]he constitutional sport of [Aiello] and last Term’s even sillier statutory counterpart, General Elec. Co. v. Gilbert, 429 U. S. 125 (1976), with their Alice-in-Wonderland view of pregnancy as a sex-neutral phenomenon, are good candidates for early retirement. These decisions are textbook examples of the effects of underrepresentation on “legislative” insensitivity. Imagine what the presence of even one woman Justice would have meant to the Court’s conferences.”).